**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

     *Plaintiff,*

  v.

NATIONAL CINEMEDIA, INC.,
NATIONAL CINEMEDIA, LLC,
SV HOLDCO, LLC, and
SCREENVISION, LLC,

     *Defendants.*

Case No. 14-CV-8732 (AT)

(ECF Case)

## DEFENDANTS NATIONAL CINEMEDIA, INC.'S AND
## NATIONAL CINEMEDIA, LLC'S ANSWER TO COMPLAINT

Defendants National CineMedia, Inc. ("NCM Inc.") and National CineMedia, LLC ("NCM LLC" and collectively with NCM Inc., "NCM") hereby respond to the allegations of Plaintiff's November 3, 2014 Complaint.  NCM denies all factual allegations in the Complaint unless expressly admitted.  Any admission herein is limited to the express language of the response.  This Answer responds only to the allegations against NCM.  Nothing herein constitutes a comment as to the truth or falsity of the Complaint as to other Defendants SV Holdco, LLC and Screenvision, LLC ("SV"); NCM denies knowledge or information sufficient to form a belief as to such allegations.  Likewise, nothing herein constitutes a comment on Plaintiff's legal theories, arguments or conclusions because such legal assertions require no response in this Answer.  NCM makes no response, as no response is required, to headings in the Complaint.

# I.   INTRODUCTION

1.      *More than two-thirds of the U.S. population goes to the movies at least once every year. On almost all movie screens, before the previews and feature film begin, the audience is presented with a preshow — a video program consisting of advertisements, special content segments (e.g., a "behind the scenes" look at a new TV show featuring interviews with the cast), and theater announcements. The preshow is typically twenty to thirty minutes long and is designed to engage moviegoers as they wait for the feature film to start.*

**Response:**      NCM admits that preshows vary in time, content, length and quality. NCM denies that almost all movie screens present a preshow as described in this paragraph. NCM lacks knowledge or information sufficient to form a belief of the truth of the remaining allegations of this paragraph, and, therefore, denies them.

2.      *For advertisers, the preshow is a unique opportunity to reach an attentive audience using a large screen with the benefit of high-quality video and sound. For movie theater owners ("exhibitors"), many of them small businesses, the revenue earned from preshow advertisements provides an important source of income that supplements revenue earned through ticket sales and concessions.*

**Response:**      NCM admits that cinema advertising accounts for less than 1% of dollars spent by advertisers on video advertising.  NCM understands that preshow advertising revenue accounts for approximately 2-3% of exhibitor revenues.  NCM denies the remaining allegations in this paragraph.

3.      *Cinema advertising networks act as intermediaries between exhibitors and advertisers. The networks sell screen time to advertisers and package the advertisements and content into a preshow, and exhibitors display the preshow on their movie screens. The networks retain a portion of the advertising proceeds for the services they provide.*

**Response:**      NCM admits that it sells advertising on its network to advertisers, and exhibitor affiliates of the network receive a share of the revenues from the sale of advertising.

NCM admits that it creates a preshow for its network affiliates to display.  NCM denies the remaining allegations in this paragraph.

      4.        *Defendants NCM and Screenvision are the only two significant cinema advertising networks in the United States. Together they serve about 88% of all movie screens in the country:*



    **Response:**     NCM denies the allegations in this paragraph.

      5.        *NCM and Screenvision compete head-to-head in selling cinema advertising to advertisers and in providing preshow services to exhibitors.  Over the past two years, the competition between Defendants has intensified as Screenvision has evolved into a particularly aggressive competitor. In late 2012, Screenvision increased its efforts to sell national advertising and steal share from NCM by reducing its cinema advertising prices and offering exhibitors better financial incentives. This strategy has allowed Screenvision to make significant inroads at NCM's expense.*

    **Response:**     NCM admits that it competes with broadcast television, cable networks, online networks, mobile networks, cinema networks, and others to sell video advertising.  NCM further admits that it sometimes competes with Screenvision and other third parties in seeking exhibitors to affiliate with its network.  NCM denies the remaining allegations in this paragraph.

6.      *Concerned about eroding margins in the face of this intensified competition, NCM determined it had two options: it could compete more aggressively, or it could acquire its only competitor. NCM chose the latter.*

**Response:**      NCM denies allegations in this paragraph.

7.      *Section 7 of the Clayton Act prohibits mergers that "tend to create a monopoly," and that is precisely what this proposed transaction would do. If allowed to proceed, the proposed transaction would eliminate competition that has yielded substantial benefits for exhibitors and advertisers. For the reasons set forth below, the proposed transaction should be enjoined.*

**Response:**      This paragraph contains a legal conclusion and non-factual statement to which no response is required.  NCM denies the remaining allegations of this paragraph.

## II.      DEFENDANTS AND THE TRANSACTION

8.      *NCM LLC is a Delaware limited liability company headquartered in Centennial, Colorado. It has a national cinema advertising network that covers about 20,000 of the approximately 39,000 movie screens in the United States. It sells cinema advertising that reaches moviegoers across the United States. In 2013, NCM LLC earned approximately $426 million in gross advertising revenue.*

**Response:**      NCM admits the first sentence of this paragraph.  NCM refers to reported advertising revenue in NCM Inc.'s filings with the Securities and Exchange Commission for complete and accurate revenue information for NCM.  NCM denies the remaining allegations in this paragraph.

9.      *NCM Inc. is a Delaware corporation headquartered in Centennial, Colorado. NCM Inc. is the managing member and owner of 45.8% of NCM LLC. The remaining 54.2% is owned by the three largest exhibitors in the United States – Regal Entertainment Group ("Regal") (20.1%), AMC Entertainment Inc. ("AMC") (15.0%), and Cinemark Holdings, Inc. ("Cinemark") (19.1%).*

**Response:**      NCM admits the first sentence of this paragraph.  NCM further admits that NCM Inc. is the managing member and owner of 45.8% of NCM LLC.  NCM refers to reported ownership interests in NCM's filings with the Securities and Exchange Commission for more

complete and accurate shareholder information.  NCM denies the remaining allegations of this

paragraph.

> 10.    *These three exhibitors (the so-called "Founding Members") exercise a significant degree of control and influence over NCM. In addition to holding 54% of NCM's equity, they have representatives on NCM's Board of Directors and enjoy substantial governance rights, including approval rights over certain NCM contracts with competing exhibitors. NCM management routinely consults with executives of the Founding Members.*

**Response:**    NCM refers to its corporate governance documents for a complete and

accurate statement of the involvement of Founding Members in the governance of NCM.  NCM

denies the remaining allegations in this paragraph.

> 11.    *Screenvision is a Delaware limited liability company headquartered in New York, New York. It has a national cinema advertising network that covers approximately 14,300 screens in the United States. For approximately 3,200 of those screens, Screenvision provides national advertising through brokers. Carmike, the fourth largest exhibitor in the United States, owns a 19% share of Screenvision. In 2013, Screenvision earned approximately $160 million in gross advertising revenue.*

**Response:**    NCM lacks knowledge or information sufficient to form a belief about the

truth of this allegation regarding another party.  NCM denies the remaining allegations in this

paragraph.

> 12.    *SV Holdco, LLC is a Delaware limited liability company headquartered in New York, New York, and is the parent of Screenvision, LLC.*

**Response:**    NCM lacks knowledge or information sufficient to form a belief about the

truth of this allegation regarding another party.  NCM denies the remaining allegations in this

paragraph.

> 13.    *On May 5, 2014, NCM Inc. agreed to purchase Screenvision LLC from SV Holdco, LLC for $375 million, consisting of $225 million in cash and*

> *approximately 10 million shares of NCM Inc. common stock, subject to adjustment.*

**Response:**     NCM admits that on May 5, 2014, National CineMedia, Inc. agreed to acquire Screenvision, LLC from SV Holdco, LLC for $375 million, consisting of $225 million in cash and $150 million in National CineMedia, Inc. common stock, subject to adjustment.

### III.     JURISDICTION, INTERSTATE COMMERCE, AND VENUE

> 14.     *The United States brings this action, and this Court has subject-matter jurisdiction over this action, under Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.*

**Response:**     NCM admits that the United States purports to bring this action pursuant to Section 15 of the Clayton Act, and that the United States purports to seek to prevent and restrain Defendants from violating Section 7 of the Clayton Act.  NCM denies that the merger violates the Clayton Act in any way and further denies the remaining allegations in this paragraph.

> 15.     *Defendants are engaged in, and their activities substantially affect, interstate commerce. Screenvision and NCM provide preshow services to thousands of theaters across all fifty states. Both also sell cinema advertising to advertisers throughout the United States.*

**Response:**     NCM admits that it is engaged in activities that affect interstate commerce. NCM denies that its network includes affiliates in all 50 states.  NCM denies the remaining allegations in this paragraph.

> 16.     *Venue is proper under Section 12 of the Clayton Act, 15 U.S.C. § 22. This Court also has personal jurisdiction over each Defendant. Both Defendants transact business in this judicial district.*

**Response:**     Admitted as to NCM.

## IV.    INDUSTRY BACKGROUND

### A.    Preshows

17.    *A preshow is video programming that plays on a movie screen in advance of the previews and feature film. It consists primarily of national, regional, and local advertisements but also contains announcements explaining theater policies, previews of special theater events, and special "behind-the-scenes" content segments promoting new and upcoming TV shows, movies, and other products.*

**Response:**    NCM admits that its preshow typically is displayed by exhibitors in advance of movie previews and the feature film.  NCM also admits that its preshow typically consists of a mix of national, regional, and local advertisements, and may also contain third-party content segments and/or exhibitor-produced content segments.  To the extent that the allegations in this paragraph pertain to preshows provided by other companies, NCM lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and denies them on that basis.  NCM denies the remaining allegations in this paragraph.

18.    *The preshow is divided into segments, typically an early and a late preshow. Advertisements for local or regional businesses near a theater's location (e.g., a local dentist or restaurant) generally play in the early preshow, while advertisements for products sold nationwide (e.g., cars or cell phone service) generally play in the late preshow, closer to the scheduled show time of the feature film when more moviegoers are in their seats. A typical preshow will have as many as twelve to fourteen minutes of advertising, broken up into 15, 30, 60, or 90 second spots.*

**Response:**    NCM admits that its preshow is divided into segments and advertisements are broken down into spots.  To the extent that the allegations in this paragraph pertain to preshows provided by other companies, NCM lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and denies them on that basis. NCM denies the remaining allegations in this paragraph.

19. *Cinema advertising has important attributes that differentiate it from other forms of advertising. The preshow is projected on a large screen with high-quality video and sound in a darkened auditorium. In contrast to TV and other video advertising platforms, the audience cannot avoid the advertisements by fast forwarding through them, clicking past them, or changing a channel. The preshow also allows for long-form advertisements typically not available on TV (e.g., a 90 second spot), and reaches a weekend audience and light TV viewers who are otherwise difficult to reach.*

**Response:**    NCM denies the allegations of this paragraph.

20. *National advertisers pay for cinema advertising on a cost-per-thousand ("CPM") impressions basis, meaning that advertisers pay the network a set amount per moviegoer.*

**Response:**    NCM admits that CPM is a price unit in the advertising business.  NCM denies the remaining allegations in this paragraph.

### B.    The Sale of Preshow Services to Exhibitors

21. *For exhibitors, the preshow represents a unique opportunity to supplement revenue earned through ticket sales and concessions. Because much of the revenue generated through ticket sales must be paid to the movie studios, the ability to earn a revenue stream from preshow advertising is especially important for exhibitors.*

**Response:**    NCM lacks sufficient knowledge or information sufficient to form a belief regarding exhibitor motivations or the details of their business models.  NCM understands that approximately 2-3% of exhibitor revenue is generated from the sale of on-screen advertising.  NCM denies the remaining allegations in this paragraph.

22. *To obtain preshows, exhibitors enter into long-term, exclusive contracts with Defendants. Under the contracts, Defendants commit to marketing the preshow screen time to advertisers and packaging the advertisements and other content into an entertaining video program. Exhibitors agree to display the preshow on their movie screens. The networks retain a portion of the advertising proceeds for the services they provide.*

**Response:**     NCM admits that it enters into exclusive contracts with its exhibitor network affiliates and that the contracts vary significantly in length of duration.  NCM further admits that it shares advertising revenue with each of its exhibitor network affiliates pursuant to contracts with each of those affiliates.  NCM denies the remaining allegations in this paragraph.

23.     *Cinema advertising networks sell advertising time to advertisers seeking to market their products on a local, regional, or national basis. Generally, national advertisers seek to purchase cinema advertising from firms that can provide access to a nationwide network of movie screens. Thus, Defendants work hard to enter into contracts with exhibitors throughout the country and compete vigorously to steal exhibitors from each other.*

**Response:**     NCM admits that cinema advertising networks sell advertising time to a variety of advertisers.  NCM also admits that many national advertisers seek scale, coverage and targeting capabilities when purchasing a video advertising campaign.  To the extent that the allegations in this paragraph pertain to the actions of other companies, NCM lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and denies them on that basis.  NCM denies the remaining allegations in this paragraph.

### C.     Defendants Are the Only Significant Competitors Offering Preshow Services to Exhibitors

24.     *As NCM's top executive in charge of exhibitor relations has acknowledged, there are only "two national players in the preshow space." NCM and Screenvision collectively serve approximately 88% of the movie screens in the United States.*

**Response:**     NCM refers to the entire transcript for a complete and accurate description of testimony from which Plaintiff has selected a quote from the Plaintiff and not NCM.  NCM lacks sufficient knowledge or information to form a belief regarding the percentages listed in this paragraph.  NCM denies the remaining allegations in this paragraph.

25.     *Through contracts with exhibitors, NCM and Screenvision have each established a nationwide network of movie screens. NCM's cinema advertising network*

*covers about 20,000 of the approximately 39,000 screens in the United States, including screens in 49 of the top 50 designated market areas ("DMAs"); Screenvision's cinema advertising network covers about 14,300 screens, including screens in all 50 states, each of the top 50 DMAs, and 94% of all DMAs. DMAs are geographic areas of the United States ranked by population size. National advertisers are typically interested in reaching the top DMAs, which are the most populous areas of the country.*

**Response:**     NCM admits that it has some presence 49 of the 50 top U.S. DMAs.

NCM denies the remaining allegations in this paragraph.

26. *Spotlight Cinema Networks ("Spotlight") is the only other cinema advertising network that attracts national advertisers. Spotlight is a niche player with a network of about 700 screens in art-house and luxury theaters. It offers its exhibitors short preshows that are limited to only a few minutes and typically contain only national advertisements. Spotlight's small network of exhibitors caters to a narrow demographic of moviegoers – an older, affluent audience that appeals to a small subset of national advertisers marketing luxury products and brands. Thus, it does not offer a viable alternative to Defendants' networks for advertisers seeking to market their products to a diverse national audience. And because Spotlight does not attract such advertisers, it is not a meaningful alternative for the mainstream exhibitors that obtain preshow services from Defendants.*

**Response:**     NCM denies the allegations in this paragraph.

27. *Although local advertising brokers provide preshow services to exhibitors (and a handful of exhibitors perform these services for themselves), their market shares are small. These firms focus on selling to local and regional advertisers, and their exhibitors' theaters generally draw relatively small audiences. To the extent their preshows include national advertisements, those advertisements are typically sold by Screenvision in exchange for a share of the advertising revenue. These brokers' reliance on Screenvision for national advertising limits their competitive significance.*

**Response:**     NCM lacks sufficient knowledge or information regarding other cinema advertising brokers to form a belief as to these allegations.  NCM denies the remaining allegations in this paragraph.

### D.   Competition Between Defendants Has Resulted in Substantial Benefits for Exhibitors

28.   *NCM and Screenvision compete head-to-head to win exclusive contracts with exhibitors. Because most movie screens in the United States are under contract with either NCM or Screenvision, Defendants compete to steal share from one another when these multi-year contracts come up for renewal or are renegotiated. According to Screenvision's internal bid tracking reports, Screenvision faced NCM on almost all of its contested bidding opportunities (measured by screens) over the past three years. By contrast, Screenvision faced Spotlight – the niche firm that caters to art-house and luxury theaters – on only a small fraction of bids during this period.*

**Response:**   NCM admits that its contracts with exhibitors are normally exclusive. NCM lacks sufficient knowledge or information regarding Screenvision's internal bid tracking reports to respond to that portion of the paragraph.  NCM denies trying to "steal share" from SV, but admits that it attempts to retain and expand its affiliate partnerships.  NCM denies the remaining allegations in this paragraph.

29.   *NCM and Screenvision carefully monitor each other's efforts to win contracts with exhibitors. Each keeps close tabs on the expiration dates of the other's exhibitor contracts, identifying as key prospects exhibitors whose theaters draw large audiences or are located in particular geographic areas, such as the top DMAs. Armed with this information, Defendants approach exhibitor prospects with proposals to renew their contracts or switch networks. In many instances, this approach is made several years before the contract expires.*

**Response:**   NCM admits that it seeks to retain its partnership with exhibitors at the expiration of contracts, and that it seeks to increase its network of affiliates because it gives NCM a better network to offer advertisers, which benefits all of its affiliates.  NCM denies the remaining allegations in this paragraph.

30.   *Typically, contract negotiations with exhibitors involve multiple rounds of proposals with exhibitors playing NCM and Screenvision off each other to obtain the most advantageous contract terms. NCM and Screenvision compete vigorously by offering attractive pricing terms such as a more favorable revenue share, a higher minimum payment guarantee, or an upfront payment at the*

*beginning of the contract term. One or both firms may also offer to subsidize some equipment costs.*

**Response:**    NCM denies the allegations in this paragraph.

31.    *The competition between Defendants has resulted in significant financial benefits for exhibitors. NCM and Screenvision often match or exceed the other's bids. For example, in the spring of 2011, NCM ended a bidding war for a Screenvision exhibitor affiliate by offering a $14.5 million upfront payment. In the fall of 2013, Screenvision offered an additional $1 million as a signing bonus to retain another one of its exhibitor affiliates.*

**Response:**    NCM denies the allegations in this paragraph.

32.    *NCM and Screenvision also battle over the non-price terms of their contracts with exhibitors, affording exhibitors greater flexibility and control over the preshows and higher-quality programming. Screenvision has been particularly accommodating of exhibitors' preferences, extolling its flexibility relative to NCM as a way of winning or keeping exhibitors. For instance, Screenvision offers some exhibitors the right to reject preshow content, including the advertisements themselves. Screenvision also allows exhibitors to opt for a shorter preshow, which frees up more screen time for exhibitors to promote their own products or schedule additional movie showings. NCM generally provides uniform preshows to exhibitors, but on at least one occasion, the presence of a competing bid from Screenvision forced NCM to match the creative approval rights offered by Screenvision. NCM and Screenvision also compete by producing high-quality preshows with engaging content.*

**Response:**  NCM denies the allegations in this paragraph.

### E.    Screenvision Has Evolved into a More Aggressive Competitor

33.    *Before 2012, NCM and Screenvision commanded CPMs for cinema advertising that were substantially higher than those of other media (including primetime TV and cable) and enjoyed large margins. After Screenvision was acquired by a private equity firm in 2010, an outside consultant retained to analyze the business concluded that NCM was benefitting disproportionately from the status quo. While CPMs were high, key advertiser accounts went to NCM, and Screenvision's revenues were on the decline.*

**Response:**     NCM lacks sufficient knowledge or information sufficient to form a belief regarding allegations about an SV outside consultant.   NCM denies the remaining allegations in this paragraph.

34.     *In late 2012, in an effort to reverse this trend, Screenvision adopted an aggressive pricing strategy that involved lowering its CPMs to undercut NCM's prices by 50% or more. After launching this new strategy, Screenvision's head of advertising sales instructed his staff: "We will not lose [to NCM] on price. . . . You must do whatever we need to do and win these head to head battles."*

**Response:**     NCM lacks sufficient knowledge or information sufficient to form a belief regarding these allegations.  NCM denies the remaining allegations in this paragraph.

35.     *Observing that Screenvision had adopted "[a] very unusual strategy in a duopoly," NCM was deeply concerned about this "wholesale change" to the industry caused by Screenvision's aggressive pricing strategy, viewing it as a "direct threat to [NCM's] business model."*

**Response:**     NCM admits that these quotes were selected from documents involving NCM employees, and refers to the quoted documents for a complete and accurate description of their contents.  NCM denies the remaining allegations in this paragraph.

36.     *NCM decided to lower its CPMs to compete with Screenvision on specific buys. Advertisers and their advertising agencies embraced this intensified price competition. Executives from both NCM and Screenvision reported instances in which advertisers pushed Defendants to compete vigorously on price. For example, a Screenvision executive announced that a particular customer said it was opening up a bid to both NCM and Screenvision "and [they] will have to battle it out on pricing." An NCM executive reported that Screenvision "told [an] agency [Screenvision] will beat us on any price."*

**Response:**     NCM admits that a quotation was selected from a document involving NCM employees, and refers to the quoted document for a complete and accurate description of its contents.  NCM lacks sufficient knowledge or information sufficient to form a belief

regarding quotations from documents related to another party.  NCM denies the remaining allegations in this paragraph.

> 37.    *Hoping that various NCM initiatives would force Screenvision to "blink" and abandon its new price-cutting strategy, NCM's CEO resisted a wholesale change in NCM's pricing policy, declaring in late 2013 that Screenvision's pricing strategy was commoditizing cinema advertising and refusing to follow Screenvision "down the pricing death spiral!!!!!!!!!!!!"*

**Response:**    NCM admits that these quotes were selected from a document involving NCM employees, and refers to the quoted document for a complete and accurate description of its contents.  NCM denies the remaining allegations in this paragraph.

> 38.    *By early 2014, Screenvision was having a significant impact on NCM. In a February 2014 presentation to its Board of Directors, Screenvision reported: "We woke the beast. In spite of fundamental differences in strategy, NCM is quick to drop price."*

**Response:**    NCM lacks sufficient knowledge or information sufficient to form a belief regarding these allegations about another party's documents.  NCM denies the remaining allegations in this paragraph.

> 39.    *Screenvision's new strategy proved effective. Over a period of 18 months, Screenvision won substantial advertising business from NCM and reversed its downward revenue trend. Screenvision augmented its CPM pricing strategy by offering advertisers attractive new terms such as demographic guarantees, i.e., commitments to deliver a set number of impressions to a targeted demographic.*

**Response:**    NCM denies the allegations in this paragraph.

> 40.    *Screenvision also continued competing aggressively for exhibitor contracts. For example, Screenvision's approach in a recent battle to win a large exhibitor contract was so aggressive that it prompted a senior NCM executive to observe, "[w]e need to buy [Screenvision] before either us or [Screenvision] does a stupid deal with [the exhibitor]."*

**Response:**      NCM admits that this quote was selected from a document involving

NCM employees, and refers to the quoted document for a complete and accurate description of

its contents.  NCM denies the remaining allegations in this paragraph.

### F.      The Proposed Merger Is Driven by NCM's Desire to Eliminate Competition from Screenvision

*41.      By April 2014, NCM had arrived at what it called a "Strategy Decision Crossroads," identifying two possible ways to cope with Screenvision's competitive tactics. One option, "Plan A," was to acquire Screenvision, which NCM executives had been considering for some time. As NCM previously had concluded, acquiring Screenvision would give NCM the ability to "Control Selling Tactics," including "Pricing." NCM's "Plan B" was to compete with Screenvision by "[r]eset[ting] NCM CPMs to current market levels" and "continuing to expand impression base through Affiliate additions." By early May 2014, NCM had resolved its internal debate, choosing to buy Screenvision instead of competing with it.*

**Response:**      NCM admits that these quotes were selected from documents involving

NCM employees, and refers to the quoted documents for a complete and accurate description of

their contents.  NCM denies the remaining allegations in this paragraph.

### V.      THE RELEVANT MARKETS

*42.      Cinema advertising networks operate in two distinct markets: preshow services sold to exhibitors and cinema advertising sold to advertisers.*

**Response:**      This paragraph contains a legal conclusion and non-factual statement to

which no response is required.  To the extent a response is required, NCM denies the allegations

of this paragraph.

### A.      Preshow Services

*43.      Preshow services consist of the packaging of advertisements and content into a preshow delivered to exhibitors, enabling them to earn revenue from the use of their screens before the feature film. The price charged to exhibitors for preshow services is the portion of advertising revenue retained by the network. Preshow services constitute a relevant product market and line of commerce under Section*

*7 of the Clayton Act. There are no reasonable substitutes for preshow services.
Exhibitors cannot easily replace the preshow services they buy from cinema
advertising networks because individual exhibitors generally lack sufficient
screens and geographic reach to secure national advertising. Nor can they
sufficiently replace national advertising in preshows with local advertising
because local advertising generates much less revenue than national advertising.*

**Response:**     This paragraph contains a legal conclusion and non-factual statement to

which no response is required.  NCM denies the remaining allegations in this paragraph.

44.     *A well-accepted methodology for assessing a relevant market for antitrust
analysis is to ask whether a hypothetical monopolist over all products in the
market would profitably impose at least a small but significant and non-transitory
increase in price, or SSNIP. Fed. Trade Comm'n & U.S. Dep't of Justice
Horizontal Merger Guidelines (2010). The market for preshow services satisfies
this test. Because there are no reasonable substitutes for preshow services, a
hypothetical monopolist of all such services would increase price by at least a
SSNIP. Thus, the market for preshow services is an antitrust relevant market.*

**Response:**     This paragraph contains a legal conclusion and non-factual statement to

which no response is required.  NCM denies the remaining allegations in this paragraph.

### B.     Cinema Advertising

45.     *Cinema advertising is the on-screen advertising incorporated in the preshow. The
sale of cinema advertising to advertisers is a relevant product market and line of
commerce under Section 7 of the Clayton Act. Cinema advertising has important
attributes that differentiate it from other forms of video advertising. For example,
the preshow is projected on a large screen with high-quality video and sound in a
darkened auditorium. In contrast to TV and other video advertising platforms, the
audience cannot avoid the advertisements by fast forwarding through them,
clicking past them, or changing a channel. The preshow also allows for long-form
advertisements typically not available on TV, and it reaches a weekend audience
and light TV viewers who are otherwise difficult to reach.*

**Response:**     This paragraph contains a legal conclusion and non-factual statement to

which no response is required.  NCM denies the remaining allegations in this paragraph.

46.     *Many advertisers value the combination of attributes afforded by cinema
advertising, and few would switch to other forms of video advertising in response
to a SSNIP of cinema advertising. A hypothetical monopolist over all cinema*

*advertising would profitably impose a SSNIP and thus, the market for cinema advertising is an antitrust relevant market.*

**Response:**     This paragraph contains a legal conclusion and non-factual statement to which no response is required.  NCM denies the remaining allegations in this paragraph.

47.     *NCM and Screenvision compete with each other throughout the United States. Exhibitors and advertisers in the United States would not switch to cinema advertising networks located outside the United States in the event of a SSNIP in the United States. Accordingly, the United States is a relevant geographic market within the meaning of Section 7 of the Clayton Act.*

**Response:**     This paragraph contains a legal conclusion and non-factual statement to which no response is required.  To the extent a response is required, NCM denies the remaining allegations in this paragraph.

## VI.     ANTICOMPETITIVE EFFECTS

### A.     The Proposed Transaction Would Eliminate Competition in the Market for Preshow Services

48.     *NCM's acquisition of Screenvision would end the vigorous competition between these firms, leaving exhibitors at the mercy of a monopolist. Because these firms closely monitor each other and battle for market share, the competition between them provides tangible benefits for exhibitors with respect to price and quality. If allowed to proceed, the merger would eliminate the competition that has yielded these benefits, potentially forcing exhibitors to raise prices to consumers or forgo theater improvements in order to offset the resulting reduction in revenue.*

**Response:**     This paragraph contains a legal conclusion and non-factual statement to which no response is required.  To the extent a response is required, NCM denies the remaining allegations in this paragraph.

49.     *NCM would be free to impose its will on exhibitors and likely would offer them reduced financial inducements, e.g., lower revenue shares, minimum guarantees, and upfront payments. NCM is also likely to stop offering its exhibitors the greater flexibility and control over the preshow that is a hallmark of Screenvision's competitive strategy.*

**Response:**     NCM denies the allegations in this paragraph.

50.     *Even before the expiration of their contracts, exhibitors likely would suffer from the loss of competition because the contracts do not completely insulate them from harm. For example, under the existing contracts, when an advertiser buys less than the entire network of movie screens, Defendants have the ability to steer advertising to the theaters of their choice. Post-merger, in the absence of competition, the combined firm would have the ability and incentive to favor exhibitors that have signed new contracts on less favorable terms or favor its Founding Members (Regal, AMC, and Cinemark) by placing more lucrative advertisements with them. Pre-merger, the prospect of competition at the end of a contract term creates an incentive for Defendants to market advertising time to maximize their chances of retaining independent exhibitor affiliates.*

**Response:**     NCM denies the allegations in this paragraph.

51.     *For certain NCM exhibitors, the proposed merger has already resulted in a meaningful loss of competition. Before the decision to merge with NCM, Screenvision had viewed the "next couple of years as opportunistic years to potentially gain some share from [NCM]" by going after exhibitors whose contracts were expiring. But the decision to merge dampened Screenvision's appetite to compete for these contracts. As Screenvision's head of exhibitor relations testified, "[I]f we had not announced a merger six months ago, I would know exactly what's expiring when, but I've kind of not pursued those circuits, because I don't think they would think about signing a deal with Screenvision – moving from NCM to sign a deal with Screenvision when they may be – we may be one company by that time."*

**Response:**     NCM lacks sufficient knowledge or information sufficient to form a belief regarding allegations related to other parties.  NCM denies the remaining allegations in this paragraph.

52.     *Defendants have already taken steps to stabilize current rates and contract terms. Before the merger announcement, Defendants had been competing aggressively for exhibitors, offering increasingly better financial terms and other incentives. After the merger announcement, NCM and Screenvision offered to freeze existing contract rates for an additional five years, which served to deprive exhibitors of the benefits of head-to-head competition that likely would have occurred if not for the proposed merger. In doing so, NCM made one key change, eliminating "minimum patron guarantee" escalation clauses that had served to protect exhibitor revenues. These clauses had been offered when NCM and Screenvision were competing aggressively against each other but, looking at a future without*

*competition from Screenvision, NCM determined it no longer needed to offer them.*

**Response:**   NCM denies the allegations in this paragraph.

53.   *Neither NCM nor Screenvision likely would have pursued a blanket contract extension strategy in the absence of the proposed merger. When asked whether Screenvision had ever previously offered such a blanket contract extension, Screenvision's CEO replied: "No, we haven't." He explained, "Well, we actually never in the past ever expected we would get any positive response from sending out these notices." Before the merger announcement, exhibitors seeking to improve contract terms at renewal likely would have been unwilling to extend their existing rates and terms for an additional five years. The announcement of the proposed merger changed this calculus – making the extension of today's rates more appealing than the prospect of negotiating new rates and terms with a monopolist.*

**Response:**   NCM lacks sufficient knowledge or information sufficient to form a belief regarding allegations related to other parties.  NCM denies the remaining allegations in this paragraph.

54.   *Finally, if the merger were allowed to proceed, independent exhibitors would lose the option of buying preshow services from a network that is not jointly owned by the three largest exhibitors in the United States – Regal, AMC, and Cinemark. These exhibitors, NCM's Founding Members, exercise a significant degree of influence over NCM, including the ability to affect NCM's dealings with competing, independent exhibitors. For example, the Founding Members have the right to block NCM from entering into contracts with expenditures exceeding $1 million. Upfront payments exceeding $1 million are common when NCM and Screenvision compete aggressively for exhibitors, and NCM has to submit such proposed independent exhibitor contracts to the Founding Members for their review and approval. Moreover, NCM has consulted with Founding Members' executives on proposed contract terms that NCM is considering offering to independent exhibitors, including whether NCM should implement the recent strategy to offer five-year contract extensions.*

**Response:**   NCM denies the allegations in this paragraph.

55.   *NCM's ownership structure is an important consideration for many exhibitors in choosing between NCM and Screenvision. One Screenvision executive who works on deals with exhibitors described the "competitive advantage" of Screenvision's ownership structure: "[W]e cater to many independent theatre owners, where*

*NCM has a tendency to express favoritism towards their 3 founding exhibitors." The Founding Members would have the incentive to raise their rivals' costs for preshow services and the ability to do so through their influence over the operation of the merged firm. The competitive effects of the proposed merger are likely to be more pronounced as a result of this incentive.*

**Response:**   NCM lacks sufficient knowledge or information sufficient to form a belief regarding allegations related to other parties. NCM denies the remaining allegations in this paragraph.

### B.   The Proposed Transaction Would Eliminate Competition between NCM and Screenvision for Advertisers

56.   *NCM's acquisition of Screenvision would also end the vigorous competition between NCM and Screenvision for the sale of cinema advertising. For NCM and Screenvision, by far the most important constraint when they negotiate with advertisers is the risk that advertisers will turn to the other network. The merger would remove that competitive constraint. Screenvision's aggressive tactics over the past 18 months have triggered a price war between the firms, resulting in substantially lower prices and better terms for advertisers. If allowed to proceed, the merger would eliminate the competition that has yielded these benefits and lead to higher prices. For NCM, the prospect of eliminating this vigorous competition was a key driver of the deal.*

**Response:**   NCM denies the allegations in this paragraph.

57.   *The merger would also eliminate an important source of innovation for advertisers. Screenvision has been a driving force behind recent quality improvements, leading NCM executives to push their teams to "stay on top of our game." As one NCM executive noted, "it's not just about price, [Screenvision] caves on every point and gives clients/agencies everything they ask for and more." A 2014 annual survey of agencies and advertisers confirmed this observation, with Screenvision receiving top ranking in nearly every category, including for "Innovative and Creative Opportunities" and "Advanced Research Insights and Support."*

**Response:**   NCM admits that several quotes were selected from documents involving NCM employees, and from a separate annual survey for which NCM lacks sufficient knowledge or information to form a belief as to its contents; NCM refers to the quoted documents for a

complete and accurate description of their contents.  NCM denies the remaining allegations in this paragraph.

> 58.  *Screenvision has also been a leader in targeted advertising and has offered advertisers greater accountability for results. For example, in 2012, Screenvision began offering advertisers demographic guarantees, which represented a sea change in cinema advertising. As NCM's President of Marketing and Sales observed, "my reluctance to do [demographic guarantees] for ten years has been a key strategy and saves us millions of dollars. . . . I knew that the buyers would like them, but I felt that we could get away with not giving demo guarantees and minimize some downside risk." With Screenvision introducing this method of purchasing cinema advertising, however, it "create[d] the necessity for [NCM] to do the same."*

**Response:**    NCM admits that these quotes were selected from a document involving NCM employees, and refers to the quoted document for a complete and accurate description of its contents.  NCM denies the remaining allegations in this paragraph.

> 59.  *In these ways and more, Screenvision has spurred lower prices, innovation, and quality improvements in cinema advertising. If the merger were allowed to proceed, NCM would no longer face this important competitive pressure.*

**Response:** NCM denies the allegations in this paragraph.

## VII.    ABSENCE OF COUNTERVAILING FACTORS

### A.    Barriers to Entry and Expansion Are High

> 60.  *The entry barriers associated with developing a cinema advertising network are high, and thus new entry or expansion by existing competitors is unlikely to prevent or remedy the proposed merger's likely anticompetitive effects. Barriers to entry and expansion include the time and cost of developing a network of screens to achieve sufficient scale, NCM's and Screenvision's lock-up of almost all exhibitors in the United States through staggered long-term contracts, and the time and cost of building the infrastructure necessary to develop and attract national advertisers.*

**Response:**    This paragraph contains a legal conclusion and non-factual statement to which no response is required. NCM denies the remaining allegations in this paragraph.

61.    *Exhibitors cannot supply preshow services themselves as an effective alternative to the merged company. Individual exhibitors or groups of small exhibitors whose contracts with NCM or Screenvision are expiring are unlikely to be able to establish cost-effective sales forces, attract national advertisers, or otherwise develop a sufficient infrastructure to reasonably replace the merged company.*

**Response:**    NCM denies the allegations in this paragraph.

### B.    Defendants' Claimed Efficiencies Should Not Be Credited

62.    *Defendants claim that the merger would enable them to offer ubiquitous coverage, leading to an increase in both the CPMs paid by advertisers and the number of cinema advertisements sold. However, advertisers already can obtain ubiquitous coverage – they easily can, and often do, purchase cinema advertisements across both of Defendants' networks. To the extent advertisers were to pay higher CPMs as a result of the merger, it would be due to the elimination of competition and the exercise of market power by the merged firm. Defendants also claim that the merger would enable them to target advertisements more effectively, but it is unlikely that Defendants' ability to target as a combined company would be materially better than it is today. Defendants cannot demonstrate that these or any other claimed efficiencies are merger specific or sufficient to counteract the anticompetitive effects that would inevitably flow from creating a monopoly. Defendants' efficiencies claims amount to a bald assertion that bigger is somehow better for both advertisers and exhibitors even though the merger would leave them with only one supplier of cinema advertising and preshow services.*

**Response:**    NCM admits that the merger will benefit both advertisers and exhibitors; for instance, the combined network is projected to generate greater advertising revenues because it will offer advertisers a better product, which will directly increase the revenue earned by all exhibitor network affiliates.  NCM admits that the merger will allow it to target advertisements more effectively, which will benefit both exhibitors and advertisers.  NCM denies the remaining allegations in this paragraph.

## VIII.   VIOLATION ALLEGED

63.    *The United States alleges and incorporates paragraphs 1 through 62 as if set forth fully herein.*

**Response:**     NCM denies the allegations in this paragraph, as set forth in its responses to paragraphs 1 through 62.

64.     *The effect of the proposed transaction, if approved, likely would be to lessen competition substantially, and to tend to create monopoly, in interstate trade and commerce in the relevant markets, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.*

**Response:**     This paragraph contains a legal conclusion and non-factual statement to which no response is required.  To the extent a response is required, NCM denies the remaining allegations in this paragraph.

65.     *Among other things, the transaction would likely have the following effects:*

(a)  *Eliminating significant head-to-head competition between NCM and Screenvision in the provision of preshow services to exhibitors;*

(b)  *Creating a combined NCM-Screenvision with the ability to increase the revenue share received by the merged firm, and reduce or eliminate guaranteed minimum payments and upfront payments made to exhibitors;*

(c)  *Creating a combined NCM-Screenvision with the ability to reduce the quality of preshow services to exhibitors;*

(d)  *Eliminating significant head-to-head competition between NCM and Screenvision for the sale of cinema advertising; and*

(e)  *Causing prices to rise for cinema advertising.*

**Response:**     NCM denies the allegations in this paragraph.

## IX.     REQUEST FOR RELIEF

66.     *The United States requests:*

(a)  *That the acquisition of Screenvision by NCM Inc., and the subsequent contribution of Screenvision's assets to NCM LLC, be adjudged to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;*

(b)  *That Defendants be permanently enjoined and restrained from carrying out the planned acquisition of Screenvision by NCM Inc. or any other transaction that would combine the two companies, or would combine Screenvision and NCM LLC;*

23

(c)   *That Defendants rescind, at the option of the exhibitor, all contract extensions and contracts executed after the announcement of the proposed transaction on May 5, 2014;*

(d)   *That the United States be awarded its costs of this action; and*

(e)   *That the United States be awarded such other relief as the Court may deem just and proper.*

**Response:**     NCM denies that Plaintiff is entitled to any of the relief requested, and requests that NCM be awarded costs incurred in defending this action, and any and all other relief as the Court may deem just and proper.

## GENERAL DENIAL

NCM denies all allegations of the Complaint, except as expressly admitted in Paragraphs 1-66 above, and specifically denies that Plaintiff is entitled to any of the relief prayed for against NCM in the Complaint.  NCM expressly reserves the right to amend and/or supplement this Answer and Affirmative Defenses.

## NCM'S AFFIRMATIVE DEFENSES

NCM does not relieve Plaintiff of proving under the appropriate standard of proof all elements of the claims that Plaintiff alleges and does not assume any burdens that properly rest on Plaintiff.  For its further and separate affirmative defenses to the Complaint and the claims Plaintiff purports to assert therein, NCM avers:

1.     The Complaint fails to state a claim on which relief can be granted.

2.     Granting the relief sought is contrary to the public interest because it would, among other things, harm consumers.

24

3. NCM's acquisition of Screenvision will result in substantial merger-specific efficiencies and other pro-competitive benefits that counteract and outweigh any and all purported anticompetitive effects alleged by Plaintiff.

4. Screenvision has not knowingly or intentionally waived any applicable defenses, and it expressly reserves the right to plead additional affirmative defenses and other defenses should as they become known to Screenvision.

**WHEREFORE**, NCM respectfully requests that the Court:

1. Deny Plaintiff's contemplated relief;

2. Dismiss the Complaint in its entirety with prejudice;

3. Award NCM its costs of suit, including reasonably attorneys' fees, and;

4. Award such other and further relief as the Court deems just and proper.

Dated: November 24, 2014                    Respectfully submitted,

                                            Dechert LLP


                        By:        /s/ *Paul H. Friedman*
                                   Paul H. Friedman, Esq.
                                   Paul T. Denis, Esq.
                                   Steven G. Bradbury, Esq.
                                   Craig G. Falls, Esq.
                                   1900 K Street, NW
                                   Washington, DC 20006
                                   Telephone: (202) 261-3300
                                   Facsimile:  (202) 261-3333

                                   Michael L. Weiner, Esq.
                                   Lawrence A. Reicher, Esq.
                                   1095 Avenue of the Americas
                                   New York, NY 10036
                                   Telephone: (212) 698-3500
                                   Facsimile: (212) 698-3599

                                   Carolyn E. Isaac, Esq.
                                   Sean P. McConnell, Esq.
                                   Cira Centre
                                   2929 Arch Street
                                   Philadelphia, PA 19104
                                   Telephone: (215) 994-4000
                                   Facsimile: (215) 994-2222

                                   *Counsel for Defendants National
                                   CineMedia, Inc. and National
                                   CineMedia LLC*