UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>               Plaintiff,<br><br>    v.<br><br>NATIONAL CINEMEDIA, INC.,<br>NATIONAL CINEMEDIA, LLC, SV<br>HOLDCO, LLC, and SCREENVISION,<br>LLC,<br><br>               Defendants. | Civil Action No: 14 Civ. 8732 (AT)(FM) |

### DEFENDANTS SV HOLDCO, LLC AND SCREENVISION, LLC'S
### ANSWER TO PLAINTIFF'S COMPLAINT

Pursuant to Rules 7 and 8 of the Federal Rules of Civil Procedure, Defendants SV Holdco, LLC and Screenvision, LLC (collectively, "Screenvision") hereby respond to the allegations set forth in Plaintiff United States of America's November 3, 2014 Complaint, and state the following.  Screenvision denies all factual allegations set forth in the Complaint unless expressly admitted.  Any admission herein is limited to the express language of the response, and shall not be deemed an implied admission of additional facts.  Screenvision need not admit or deny legal argument or legal conclusions; however, Screenvision affirmatively denies that this merger violates Section 7 of the Clayton Act, 15 U.S.C. § 18, and asserts that Plaintiff should be denied all the relief it requests.

For ease of reference, Screenvision repeats certain headings set forth in the Complaint. To the extent that any headings contain any factual allegations, they are denied.

Screenvision further answers the Complaint as follows:

### I.  INTRODUCTION

**ALLEGATION 1:** More than two-thirds of the U.S. population goes to the movies at least once every year. On almost all movie screens, before the previews and feature film

begin, the audience is presented with a preshow – a video program consisting of advertisements, special content segments (e.g., a "behind the scenes" look at a new TV show featuring interviews with the cast), and theater announcements. The preshow is typically twenty to thirty minutes long and is designed to engage moviegoers as they wait for the feature film to start.

1.      Screenvision admits that many, but not all, U.S. movie screens display a preshow, which may contain a mix of paid advertisements, third-party content segments, and theater-provided content segments.  Screenvision also admits that some of these preshows typically range twenty to thirty minutes in length and are typically shown before the movie previews and feature film.  Screenvision lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 1 and, on that basis, denies them.

**ALLEGATION 2:** For advertisers, the preshow is a unique opportunity to reach an attentive audience using a large screen with the benefit of high-quality video and sound. For movie theater owners ("exhibitors"), many of them small businesses, the revenue earned from preshow advertisements provides an important source of income that supplements revenue earned through ticket sales and concessions.

2.      Screenvision admits that the preshow provides an opportunity for advertisers to reach an audience of moviegoers.  Screenvision also admits that movie theaters ("exhibitors") earn revenue from preshow advertisements.  Screenvision admits that it typically enters into long-term contracts with exhibitors under which it shares the revenue it earns through advertising with the exhibitor—for example, on a 50-50 basis.  Screenvision further admits that the revenue-share model under which it operates ties its interests to those of the exhibitors, meaning that if the merger creates a better cinema advertising product that attracts more advertisers to cinema advertising, Screenvision will be contractually committed to automatically share that incremental revenue increase with its exhibitor partners.  Screenvision admits that advertising revenues supplement revenues earned through ticket sales and concessions, but notes that its exhibitor partners earn most of their revenues from ticket sales and concessions and earn only a fraction from cinema advertising.  Screenvision denies the remaining allegations in paragraph 2.

**ALLEGATION 3:**  Cinema advertising networks act as intermediaries between exhibitors and advertisers. The networks sell screen time to advertisers and package the advertisements and content into a preshow, and exhibitors display the preshow on their movie screens. The networks retain a portion of the advertising proceeds for the services they provide.

3.      Screenvision admits that cinema advertising networks act as intermediaries

between exhibitors and advertisers, in the particular sense that Screenvision enters into contracts

(often long-term contracts) with exhibitors for the right to display preshow advertisements on

exhibitors' screens, and exhibitors participate in the revenues that Screenvision generates from

any ads that Screenvision places on their screens (e.g., on a 50-50 revenue-share basis).  To the

extent that the allegations in paragraph 3 pertain to the actions of other cinema advertising

networks, Screenvision lacks knowledge or information sufficient to form a belief as to the truth

of those allegations, and denies them on that basis.  Screenvision also denies any remaining

allegations in paragraph 3.

**ALLEGATION 4:**    Defendants NCM and Screenvision are the only two significant cinema advertising networks in the United States. Together they serve about 88% of all movie screens in the country: [Pie Chart: Share of Movie Screens in the US]

4.      Screenvision admits that Screenvision participates in the video advertising market

in the United States.  To the extent that the allegations in paragraph 4 pertain to the actions of

other cinema advertising networks, Screenvision lacks knowledge or information sufficient to

form a belief as to the truth of those allegations, and denies them on that basis.  Screenvision also

denies the remaining allegations in paragraph 4.

**ALLEGATION 5:**  NCM and Screenvision compete head-to-head in selling cinema advertising to advertisers and in providing preshow services to exhibitors. Over the past two years, the competition between Defendants has intensified as Screenvision has evolved into a particularly aggressive competitor. In late 2012, Screenvision increased its efforts to sell national advertising and steal share from NCM by reducing its cinema advertising prices and offering exhibitors better financial incentives. This strategy has allowed Screenvision to make significant inroads at NCM's expense.

5.      Screenvision admits that National Cinemedia, Inc. and National Cinemedia, LLC (collectively, "NCM") is a competitor in selling cinema advertising to advertisers.  To the extent that the phrase "compete head-to-head in selling cinema advertising to advertisers" implies that cinema advertising is a distinct product market, Screenvision denies that: Screenvision competes against other forms of video advertising (e.g., television, digital, and mobile) for advertising dollars, and cinema advertising represents less than one percent of the overall video advertising market.  Screenvision further admits that in an effort to compete better with those other forms of video advertising and gain advertising dollars typically allocated to those other forms of video advertising (particularly television), beginning in late 2012, Screenvision lowered its advertising prices to place them more in-line with certain television advertising prices.  Screenvision denies that it competes with NCM or anyone else in a business characterized as "providing preshow services to exhibitors," but admits that it competes with NCM and others in acquiring rights to display advertising in exhibitors' theaters.  To the extent that the allegations in paragraph 5 pertain to the actions of another company, Screenvision lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and denies them on that basis. Screenvision also denies any remaining allegations in paragraph 5.

**ALLEGATION 6:**    Concerned about eroding margins in the face of this intensified competition, NCM determined it had two options: it could compete more aggressively, or it could acquire its only competitor. NCM chose the latter.

6.      The allegations in paragraph 6 pertain to the actions of another company; Screenvision therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 6, and denies them on that basis.

**ALLEGATION 7:**    Section 7 of the Clayton Act prohibits mergers that "tend to create a monopoly," and that is precisely what this proposed transaction would do. If allowed to proceed, the proposed transaction would eliminate competition that has yielded substantial benefits for exhibitors and advertisers. For the reasons set forth below, the proposed transaction should be enjoined.

4

7.      Paragraph 7 contains legal argument and conclusions to which no response is required.  Screenvision denies the proposed transaction would tend to create a monopoly. Advertisers have innumerable options for where to place video advertisements, and Screenvision (on behalf of its exhibitor partners) must compete aggressively to attract those advertisers to cinema.  Screenvision further denies that exhibitors and advertisers have received "substantial benefits" from competition between NCM and Screenvision, as that term has no specific meaning that can be admitted or denied.  To the contrary, Screenvision admits that the proposed transaction will create significant benefits to advertisers (through a more attractive video advertising product) and exhibitors (through increased utilization of cinema advertising by advertisers, revenue from which is automatically passed onto exhibitors via their revenue-share agreements) that will more than offset any type of theoretical harm that the Complaint posits.

## II. DEFENDANTS AND THE TRANSACTION

**ALLEGATION 8:**  NCM LLC is a Delaware limited liability company headquartered in Centennial, Colorado. It has a national cinema advertising network that covers about 20,000 of the approximately 39,000 movie screens in the United States. It sells cinema advertising that reaches moviegoers across the United States. In 2013, NCM LLC earned approximately $426 million in gross advertising revenue.

8.      The allegations in paragraph 8 pertain to the actions of another company; Screenvision therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 8, and denies them on that basis.

**ALLEGATION 9:**  NCM Inc. is a Delaware corporation headquartered in Centennial, Colorado. NCM Inc. is the managing member and owner of 45.8% of NCM LLC. The remaining 54.2% is owned by the three largest exhibitors in the United States – Regal Entertainment Group ("Regal") (20.1%), AMC Entertainment Inc. ("AMC") (15.0%), and Cinemark Holdings, Inc. ("Cinemark") (19.1%).

9.      The allegations in paragraph 9 pertain to the actions of another company; Screenvision therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 9, and denies them on that basis.

**ALLEGATION 10:**  These three exhibitors (the so-called "Founding Members") exercise a significant degree of control and influence over NCM. In addition to holding 54% of NCM's equity, they have representatives on NCM's Board of Directors and enjoy substantial governance rights, including approval rights over certain NCM contracts with competing exhibitors. NCM management routinely consults with executives of the Founding Members.

10.     The allegations in paragraph 10 pertain to the actions of another company; Screenvision therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 10, and denies them on that basis.

**ALLEGATION 11:**  Screenvision is a Delaware limited liability company headquartered in New York, New York. It has a national cinema advertising network that covers approximately 14,300 screens in the United States. For approximately 3,200 of those screens, Screenvision provides national advertising through brokers. Carmike, the fourth largest exhibitor in the United States, owns a 19% share of Screenvision. In 2013, Screenvision earned approximately $160 million in gross advertising revenue.

11.     Screenvision admits that Screenvision, LLC is a Delaware limited liability company, with its principal place of business in New York, New York.  Screenvision also admits that Screenvision, LLC earned approximately $160 million in gross advertising revenue in fiscal year 2013.  Screenvision further admits that, as a result of its revenue-share agreements with exhibitors, Screenvision's exhibitor partners likewise earned revenues from Screenvision's ad sales commensurate with the terms of the long-term contracts with Screenvision.  Screenvision denies the remaining allegations in paragraph 11.

**ALLEGATION 12:**  SV Holdco, LLC is a Delaware limited liability company headquartered in New York, New York, and is the parent of Screenvision, LLC.

12.     Screenvision admits that SV Holdco, LLC is a Delaware limited liability company, with its principal place of business in New York, New York.  Screenvision also admits that SV Holdco, LLC is the parent company of Screenvision, LLC.

**ALLEGATION 13:**  On May 5, 2014, NCM Inc. agreed to purchase Screenvision LLC from SV Holdco, LLC for $375 million, consisting of $225 million in cash and approximately 10 million shares of NCM Inc. common stock, subject to adjustment.

6

13.     Screenvision admits that on May 5, 2014, National Cinemedia, Inc. agreed to

acquire Screenvision, LLC from SV Holdco, LLC for $375 million, consisting of $225 million in

cash and $150 million in National Cinemedia, Inc. common stock, subject to adjustment.

### III. JURISDICTION, INTERSTATE COMMERCE, AND VENUE

**ALLEGATION 14:**  The United States brings this action, and this Court has subject-matter jurisdiction over this action, under Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

14.     Screenvision admits that this Court has subject matter jurisdiction over this action.

Screenvision also admits that this action was filed by the United States under Section 15 of the

Clayton Act, 15 U.S.C. § 25, purportedly to prevent and restrain NCM and Screenvision from

violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

**ALLEGATION 15:**  Defendants are engaged in, and their activities substantially affect, interstate commerce. Screenvision and NCM provide preshow services to thousands of theaters across all fifty states. Both also sell cinema advertising to advertisers throughout the United States.

15.     Screenvision admits that it engages in activities that affect interstate commerce.

To the extent that the allegations in paragraph 15 pertain to the actions of another company,

Screenvision lacks knowledge or information sufficient to form a belief as to the truth of those

allegations, and denies them on that basis.  To the extent that paragraph 15 contains legal

argument and conclusions, no further response is required.  To the extent that a response is

required, Screenvision denies any remaining allegations in paragraph 15.

**ALLEGATION 16:**  Venue is proper under Section 12 of the Clayton Act, 15 U.S.C. § 22. This Court also has personal jurisdiction over each Defendant. Both Defendants transact business in this judicial district.

16.     Screenvision admits that venue in this judicial district is proper.  Screenvision

also admits that this Court has personal jurisdiction over Screenvision.  To the extent that the

allegations in paragraph 16 pertain to the actions of another company, Screenvision lacks

knowledge or information sufficient to form a belief as to the truth of those allegations, and

denies them on that basis.

## IV. INDUSTRY BACKGROUND

### A.     <u>Preshows</u>

**ALLEGATION 17:**   A preshow is video programming that plays on a movie screen in advance of the previews and feature film. It consists primarily of national, regional, and local advertisements but also contains announcements explaining theater policies, previews of special theater events, and special "behind-the-scenes" content segments promoting new and upcoming TV shows, movies, and other products.

17.     Screenvision admits that its preshow typically is displayed by exhibitors in

advance of movie previews and the feature film.  Screenvision also admits that its preshow

typically consists of a mix of national, regional, and local advertisements, and may also contain

third-party content segments and/or exhibitor-produced content segments.  To the extent that the

allegations in paragraph 17 pertain to preshows provided by other companies, Screenvision lacks

knowledge or information sufficient to form a belief as to the truth of those allegations, and

denies them on that basis.  Screenvision also denies any remaining allegations in paragraph 17.

**ALLEGATION 18:**  The preshow is divided into segments, typically an early and a late preshow. Advertisements for local or regional businesses near a theater's location (e.g., a local dentist or restaurant) generally play in the early preshow, while advertisements for products sold nationwide (e.g., cars or cell phone service) generally play in the late preshow, closer to the scheduled show time of the feature film when more moviegoers are in their seats. A typical preshow will have as many as twelve to fourteen minutes of advertising, broken up into 15, 30, 60, or 90 second spots.

18.     Screenvision admits that its preshow is structured in two parts: the early preshow

("EPS") and the late preshow ("LPS").  Screenvision further admits that other cinema advertising

companies may structure their preshows differently from Screenvision.  Screenvision also admits

that it generally plays national advertisements closer to the scheduled show time of the feature

film, while it generally plays local advertisements farther in time from the scheduled show time

of the feature film.  To the extent that the allegations in paragraph 18 pertain to preshows

provided by other companies, Screenvision lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and denies them on that basis.  Screenvision also denies any remaining allegations in paragraph 18.

> **ALLEGATION 19:**  Cinema advertising has important attributes that differentiate it from other forms of advertising. The preshow is projected on a large screen with high-quality video and sound in a darkened auditorium. In contrast to TV and other video advertising platforms, the audience cannot avoid the advertisements by fast forwarding through them, clicking past them, or changing a channel. The preshow also allows for long-form advertisements typically not available on TV (e.g., a 90 second spot), and reaches a weekend audience and light TV viewers who are otherwise difficult to reach.

19.     Screenvision admits that video advertising products are differentiated, and accordingly each competing form of video advertising has important attributes that differentiate it from competing advertising products.  Screenvision further admits that it markets cinema advertising as having attractive attributes for advertisers in comparison to other video advertising products, including but not limited to, projection on a large screen, high-quality video and sound, a darkened auditorium, a captive audience, and providing a weekend counterpart to TV advertising.  To the extent that paragraph 19 contains legal argument and conclusions, no further response is required.  To the extent that a response is required, Screenvision denies the remaining allegations in paragraph 19.

> **ALLEGATION 20:**  National advertisers pay for cinema advertising on a cost-per-thousand ("CPM") impressions basis, meaning that advertisers pay the network a set amount per moviegoer.

20.     Screenvision admits that national advertisers generally pay for Screenvision's cinema advertising on a projected cost-per-thousand ("CPM") basis, similar to the way that advertisers do for television and other forms of video advertising.  To the extent that the allegations in paragraph 20 pertain to cinema advertising provided by other companies, Screenvision lacks knowledge or information sufficient to form a belief as to the truth of those

allegations, and denies them on that basis.  Screenvision also denies any remaining allegations in

paragraph 20.

**B.      The Sale of Preshow Services to Exhibitors**

**ALLEGATION 21:**  For exhibitors, the preshow represents a unique opportunity to
supplement revenue earned through ticket sales and concessions. Because much of the
revenue generated through ticket sales must be paid to the movie studios, the ability to
earn a revenue stream from preshow advertising is especially important for exhibitors.

21.      Screenvision denies that its business dealings with exhibitors are appropriately

characterized as "the sale of preshow services to exhibitors."  To the contrary, Screenvision buys

rights to display advertising in exhibitors' theaters.  Screenvision admits that its preshow

provides exhibitors with a revenue opportunity due to the revenue-sharing agreements that it has

with its exhibitors.  While Screenvision lacks knowledge or information sufficient to form a

belief as to the truth of whether the revenue earned from advertising is "especially important for

exhibitors," Screenvision believes that exhibitors earn substantially less from cinema advertising

than they earn from concessions and ticket sales.  To the extent that the allegations in paragraph

21 pertain to preshows provided by other companies, Screenvision lacks knowledge or

information sufficient to form a belief as to the truth of those allegations, and denies them on that

basis.  Screenvision also denies any remaining allegations in paragraph 21.

**ALLEGATION 22:**  To obtain preshows, exhibitors enter into long-term, exclusive
contracts with Defendants. Under the contracts, Defendants commit to marketing the
preshow screen time to advertisers and packaging the advertisements and other content
into an entertaining video program. Exhibitors agree to display the preshow on their
movie screens. The networks retain a portion of the advertising proceeds for the services
they provide.

22.      Screenvision denies that its business dealings with exhibitors are appropriately

characterized as "the sale of preshow services to exhibitors."  To the contrary, Screenvision buys

rights to display advertising in exhibitors' theaters.  Screenvision admits that its exhibitor

partners enter into revenue-sharing agreements with Screenvision and share in all of the

advertising proceeds generated from preshow advertising.  Screenvision also admits that these agreements tend to be long-term agreements.  Screenvision admits that the overwhelming majority of its exhibitors have contracts that lock-in their revenue-share agreements well into the next decade—thereby negating any theoretical benefit those exhibitors could possibly gain from supposed "competition" with NCM.  Screenvision also admits that it sells screen time to advertisers.  Screenvision further admits that its exhibitor partners display the preshow on their movie screens.  To the extent that the allegations in paragraph 22 pertain to the actions of another company, Screenvision lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and denies them on that basis.  Screenvision also denies any remaining allegations in paragraph 22.

> **ALLEGATION 23:**  Cinema advertising networks sell advertising time to advertisers seeking to market their products on a local, regional, or national basis. Generally, national advertisers seek to purchase cinema advertising from firms that can provide access to a nationwide network of movie screens. Thus, Defendants work hard to enter into contracts with exhibitors throughout the country and compete vigorously to steal exhibitors from each other.

23.     Screenvision admits that Screenvision competes against numerous suppliers of video advertising screen space (including competing against television, digital, and mobile ad space suppliers) to sell screen time to advertisers.  Screenvision also admits that many national advertisers seek scale, coverage and targeting capabilities when allocating budgets to a video advertising campaign.  To the extent that the allegations in paragraph 23 pertain to the actions of other companies, Screenvision lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and denies them on that basis.  Screenvision also denies any remaining allegations in paragraph 23.

C.     <u>**Defendants Are the Only Significant Competitors Offering Preshow Services to Exhibitors**</u>

**ALLEGATION 24:**  As NCM's top executive in charge of exhibitor relations has acknowledged, there are only "two national players in the preshow space." NCM and Screenvision collectively serve approximately 88% of the movie screens in the United States.

24.     Screenvision denies that its business dealings with exhibitors are appropriately characterized as "the sale of preshow services to exhibitors."  To the contrary, Screenvision buys rights to display advertising in exhibitors' theaters.  To the extent that the allegations in paragraph 24 pertain to the actions of another company, Screenvision lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and denies them on that basis.  Screenvision also denies any remaining allegations in paragraph 24.

**ALLEGATION 25:**  Through contracts with exhibitors, NCM and Screenvision have each established a nationwide network of movie screens. NCM's cinema advertising network covers about 20,000 of the approximately 39,000 screens in the United States, including screens in 49 of the top 50 designated market areas ("DMAs"); Screenvision's cinema advertising network covers about 14,300 screens, including screens in all 50 states, each of the top 50 DMAs, and 94% of all DMAs. DMAs are geographic areas of the United States ranked by population size. National advertisers are typically interested in reaching the top DMAs, which are the most populous areas of the country.

25.     Screenvision admits that, through contracts with exhibitors and brokers, Screenvision has established a cinema advertising network that currently includes at least one screen in approximately each of the top 50 designated market areas ("DMAs") and 94% of all DMAs, although this coverage often proves inadequate for advertisers that seek truly ubiquitous national coverage akin to other forms of video advertising such as television, digital, and mobile. Screenvision also admits that DMAs are geographic areas of the United States ranked by population size.  To the extent that the allegations in paragraph 25 pertain to the actions of another company, Screenvision lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and denies them on that basis.  Screenvision also denies any remaining allegations in paragraph 25.

**ALLEGATION 26:**  Spotlight Cinema Networks ("Spotlight") is the only other cinema advertising network that attracts national advertisers. Spotlight is a niche player with a network of about 700 screens in art-house and luxury theaters. It offers its exhibitors short preshows that are limited to only a few minutes and typically contain only national advertisements. Spotlight's small network of exhibitors caters to a narrow demographic of moviegoers – an older, affluent audience that appeals to a small subset of national advertisers marketing luxury products and brands. Thus, it does not offer a viable alternative to Defendants' networks for advertisers seeking to market their products to a diverse national audience. And because Spotlight does not attract such advertisers, it is not a meaningful alternative for the mainstream exhibitors that obtain preshow services from Defendants.

26.     Screenvision denies Plaintiff's characterization of Spotlight as a "niche player," and Screenvision denies Plaintiff's allegation that Spotlight lacks the incentive or the ability to expand its national cinema advertising network.  Screenvision admits that Spotlight competes head-to-head against Screenvision to sign exhibitor contracts, and Screenvision avers that Spotlight has competed more frequently against Screenvision over time.  To the extent that the allegations in paragraph 26 pertain to the actions of another company, Screenvision lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and denies them on that basis.  To the extent that paragraph 26 contains legal argument and conclusions, no response is required.  To the extent that a response is required, Screenvision denies the remaining allegations in paragraph 26.

**ALLEGATION 27:**  Although local advertising brokers provide preshow services to exhibitors (and a handful of exhibitors perform these services for themselves), their market shares are small. These firms focus on selling to local and regional advertisers, and their exhibitors' theaters generally draw relatively small audiences. To the extent their preshows include national advertisements, those advertisements are typically sold by Screenvision in exchange for a share of the advertising revenue. These brokers' reliance on Screenvision for national advertising limits their competitive significance.

27.     Screenvision admits that a number of local or regional cinema advertising companies offer preshow advertising services to exhibitors, that these firms typically sell local or regional ads instead of national ads, and that these firms may compete against Screenvision to sign agreements with exhibitors.  Screenvision further admits that some exhibitors prefer local

advertising and may threaten to move their business to local advertising firms.  Screenvision

further admits that Screenvision has partnerships with some third-party brokers, where

Screenvision sells a portion of the advertisements in the brokers' preshow in exchange for a

share of the brokers' advertising revenue.  Screenvision also admits that some exhibitors produce

a preshow in-house.  To the extent that paragraph 27 contains legal argument and conclusions,

no response is required.  To the extent that a response is required, Screenvision denies the

remaining allegations in paragraph 27.

### D.    Competition Between Defendants Has Resulted in Substantial Benefits for Exhibitors

**ALLEGATION 28:**  NCM and Screenvision compete head-to-head to win exclusive
contracts with exhibitors. Because most movie screens in the United States are under
contract with either NCM or Screenvision, Defendants compete to steal share from one
another when these multi-year contracts come up for renewal or are renegotiated.
According to Screenvision's internal bid tracking reports, Screenvision faced NCM on
almost all of its contested bidding opportunities (measured by screens) over the past three
years. By contrast, Screenvision faced Spotlight – the niche firm that caters to art-house
and luxury theaters – on only a small fraction of bids during this period.

28.    Screenvision admits that it seeks revenue-sharing agreements with exhibitors to

expand and strengthen its cinema advertising network.  Screenvision also admits that it

sometimes competes with NCM and other third parties, including but not limited to Spotlight,

when seeking these revenue-sharing agreements with exhibitors.  Screenvision also admits that

the overwhelming majority of exhibitor contracts will not be up for renewal or renegotiation for

several years.  Indeed, Screenvision admits that at least 89% of its exhibitor partners' contracts

will not expire until 2016 or later.  Screenvision further admits that it sometimes does not

encounter any competition when seeking revenue-sharing agreements with exhibitors.  To the

extent that the allegations in paragraph 28 pertain to the actions of another company,

Screenvision lacks knowledge or information sufficient to form a belief as to the truth of those

allegations, and denies them on that basis.  To the extent that paragraph 28 contains legal

argument and conclusions, no response is required.  To the extent that a response is required,

Screenvision denies the remaining allegations in paragraph 28.

>**ALLEGATION 29:**  NCM and Screenvision carefully monitor each other's efforts to win contracts with exhibitors. Each keeps close tabs on the expiration dates of the other's exhibitor contracts, identifying as key prospects exhibitors whose theaters draw large audiences or are located in particular geographic areas, such as the top DMAs. Armed with this information, Defendants approach exhibitor prospects with proposals to renew their contracts or switch networks. In many instances, this approach is made several years before the contract expires.

29.    Screenvision admits that it sometimes competes against NCM and other third

parties when seeking revenue-sharing agreements with exhibitors, and monitors the activities of

its competitors accordingly.  Screenvision also admits that it carefully monitors efforts by

television networks and digital/online advertisers, as they all compete in the overall video

advertising market.  To the extent that the allegations in paragraph 29 pertain to the actions of

another company, Screenvision lacks knowledge or information sufficient to form a belief as to

the truth of those allegations, and denies them on that basis.  To the extent that paragraph 29

contains legal argument and conclusions, no response is required.  To the extent that a response

is required, Screenvision denies the remaining allegations in paragraph 29.

>**ALLEGATION 30:**  Typically, contract negotiations with exhibitors involve multiple rounds of proposals with exhibitors playing NCM and Screenvision off each other to obtain the most advantageous contract terms. NCM and Screenvision compete vigorously by offering attractive pricing terms such as a more favorable revenue share, a higher minimum payment guarantee, or an upfront payment at the beginning of the contract term. One or both firms may also offer to subsidize some equipment costs.

30.    Screenvision admits that it sometimes competes against NCM and other third

parties when seeking revenue-sharing agreements with exhibitors.  Screenvision denies that

contract negotiations with exhibitors "[t]ypically" involve multiple rounds of proposals with

exhibitors playing NCM and Screenvision off each other to obtain the most advantageous

contract terms.  Screenvision also denies that NCM and Screenvision compete "vigorously," as

that term has no specific meaning that can be admitted or denied.  To the extent that the

allegations in paragraph 30 pertain to the actions of another company, Screenvision lacks

knowledge or information sufficient to form a belief as to the truth of those allegations, and

denies them on that basis.  To the extent that paragraph 30 contains legal argument and

conclusions, no response is required.  To the extent that a response is required, Screenvision

denies the remaining allegations in paragraph 30.

> **ALLEGATION 31:**  The competition between Defendants has resulted in significant
> financial benefits for exhibitors. NCM and Screenvision often match or exceed the
> other's bids. For example, in the spring of 2011, NCM ended a bidding war for a
> Screenvision exhibitor affiliate by offering a $14.5 million upfront payment. In the fall of
> 2013, Screenvision offered an additional $1 million as a signing bonus to retain another
> one of its exhibitor affiliates.

31.     Screenvision denies that competition between NCM and Screenvision has resulted

in "significant financial benefits for exhibitors," as that term has no specific meaning that can be

admitted or denied.  Screenvision admits that, in the fall of 2013, Screenvision offered a

$1,480,000 signing bonus to an exhibitor (with $480,000 of the signing bonus already held by

the exhibitor).  To the extent that the allegations in paragraph 31 pertain to the actions of another

company, Screenvision lacks knowledge or information sufficient to form a belief as to the truth

of those allegations, and denies them on that basis.  Screenvision denies any remaining

allegations in paragraph 31.

> **ALLEGATION 32:**  NCM and Screenvision also battle over the non-price terms of their
> contracts with exhibitors, affording exhibitors greater flexibility and control over the
> preshows and higher-quality programming. Screenvision has been particularly
> accommodating of exhibitors' preferences, extolling its flexibility relative to NCM as a
> way of winning or keeping exhibitors. For instance, Screenvision offers some exhibitors
> the right to reject preshow content, including the advertisements themselves.
> Screenvision also allows exhibitors to opt for a shorter preshow, which frees up more
> screen time for exhibitors to promote their own products or schedule additional movie
> showings. NCM generally provides uniform preshows to exhibitors, but on at least one
> occasion, the presence of a competing bid from Screenvision forced NCM to match the
> creative approval rights offered by Screenvision. NCM and Screenvision also compete by
> producing high-quality preshows with engaging content.

32.     Screenvision admits that some exhibitors negotiate non-price terms in their revenue-sharing agreements.  To the extent that the allegations in paragraph 32 pertain to the actions of another company, Screenvision lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and denies them on that basis.  Screenvision also denies any remaining allegations in paragraph 32.

### E.     Screenvision Has Evolved into a More Aggressive Competitor

**ALLEGATION 33:**   Before 2012, NCM and Screenvision commanded CPMs for cinema advertising that were substantially higher than those of other media (including primetime TV and cable) and enjoyed large margins. After Screenvision was acquired by a private equity firm in 2010, an outside consultant retained to analyze the business concluded that NCM was benefitting disproportionately from the status quo. While CPMs were high, key advertiser accounts went to NCM, and Screenvision's revenues were on the decline.

33.     Screenvision admits that a private equity firm purchased a majority ownership stake in Screenvision in 2010, and thereafter engaged an outside consultant to analyze the business.  Screenvision denies any implication that its alleged evolution "into a more aggressive competitor" was unrelated to competition from non-cinema forms of video advertising, as such competition—far more than any change in ownership—was the driving factor.  To the extent that the allegations in paragraph 33 pertain to the actions of another company, Screenvision lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and denies them on that basis.  Screenvision also denies any remaining allegations in paragraph 33.

**ALLEGATION 34:**   In late 2012, in an effort to reverse this trend, Screenvision adopted an aggressive pricing strategy that involved lowering its CPMs to undercut NCM's prices by 50% or more. After launching this new strategy, Screenvision's head of advertising sales instructed his staff: "We will not lose [to NCM] on price.  You must do whatever we need to do and win these head to head battles."

34.     Screenvision admits that it changed its national advertising sales strategy beginning in late 2012, but denies any suggestion that this was to reverse some "trend" related to NCM alone.  Screenvision admits that its pricing strategy was enacted in order to position its

CPMs in-line with those of certain television platforms and thus better compete with other forms of video advertising.  Screenvision also admits that it produced documents which contain the quoted language at the end of paragraph 34, and that the documents speak for themselves.  To the extent Plaintiff alleges the quoted language is a broader admission by Screenvision, such allegations are denied.  Screenvision also denies the remaining allegations in paragraph 34.

> **ALLEGATION 35:**  Observing that Screenvision had adopted "[a] very unusual strategy in a duopoly," NCM was deeply concerned about this "wholesale change" to the industry caused by Screenvision's aggressive pricing strategy, viewing it as a "direct threat to [NCM's] business model."

35.     The allegations in paragraph 35 pertain to the actions of another company; Screenvision therefore lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and denies them on that basis.

> **ALLEGATION 36:**  NCM decided to lower its CPMs to compete with Screenvision on specific buys. Advertisers and their advertising agencies embraced this intensified price competition. Executives from both NCM and Screenvision reported instances in which advertisers pushed Defendants to compete vigorously on price. For example, a Screenvision executive announced that a particular customer said it was opening up a bid to both NCM and Screenvision "and [they] will have to battle it out on pricing." An NCM executive reported that Screenvision "told [an] agency [Screenvision] will beat us on any price."

36.     Screenvision admits that it produced documents which contain the quoted language in the fourth sentence of paragraph 36, and that the documents speak for themselves. To the extent Plaintiff alleges the quoted language is a broader admission by Screenvision, such allegations are denied.  To the extent that the allegations in paragraph 36 pertain to the actions of another company, Screenvision lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and denies them on that basis.  Screenvision also denies the remaining allegations in paragraph 36.

> **ALLEGATION 37:**  Hoping that various NCM initiatives would force Screenvision to "blink" and abandon its new price-cutting strategy, NCM's CEO resisted a wholesale change in NCM's pricing policy, declaring in late 2013 that Screenvision's pricing

strategy was commoditizing cinema advertising and refusing to follow Screenvision "down the pricing death spiral!!!!!!!!!!!!"

37.     The allegations in paragraph 37 pertain to the actions of another company; Screenvision therefore lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and denies them on that basis.

> **ALLEGATION 38:**  By early 2014, Screenvision was having a significant impact on NCM. In a February 2014 presentation to its Board of Directors, Screenvision reported: "We woke the beast. In spite of fundamental differences in strategy, NCM is quick to drop price."

38.     Screenvision admits that it produced documents which contain the quoted language in paragraph 38, and that the documents speak for themselves.  To the extent Plaintiff alleges the quoted statements are broader admissions by Screenvision, such allegations are denied.  To the extent that the allegations in paragraph 38 pertain to the actions of another company, Screenvision lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and denies them on that basis.  Screenvision also denies any remaining allegations in paragraph 38.

> **ALLEGATION 39:**  Screenvision's new strategy proved effective. Over a period of 18 months, Screenvision won substantial advertising business from NCM and reversed its downward revenue trend. Screenvision augmented its CPM pricing strategy by offering advertisers attractive new terms such as demographic guarantees, i.e., commitments to deliver a set number of impressions to a targeted demographic.

39.     Screenvision admits that its national advertising sales strategy beginning in late 2012—to better compete with other forms of video advertising—was, at least temporarily, effective and in the short run helped reverse Screenvision's downward revenue trend.  It has not, however, reversed the long-term shift of market share away from cinema advertising and to competing forms of video advertising.  Screenvision also admits that this national advertising sales strategy attempted to mirror many of the attributes available in television advertising, such as demographic guarantees.  However, Screenvision denies that it currently has sufficient scale

to provide the same level of targeting and demographic guarantees that television can, and

admits that one of the reasons for the proposed transaction is to create sufficient scale to better

compete with other forms of video advertising.  Screenvision further denies that the advertising

business it won was at the expense of NCM instead of other video advertising outlets.

Screenvision denies the remaining allegations in paragraph 39

> **ALLEGATION 40:**  Screenvision also continued competing aggressively for exhibitor contracts. For example, Screenvision's approach in a recent battle to win a large exhibitor contract was so aggressive that it prompted a senior NCM executive to observe, "[w]e need to buy [Screenvision] before either us or [Screenvision] does a stupid deal with [the exhibitor]."

40.     Screenvision admits that it competes for exhibitor contracts.  To the extent that

the allegations in paragraph 40 pertain to the actions of another company, Screenvision lacks

knowledge or information sufficient to form a belief as to the truth of those allegations, and

denies them on that basis.  Screenvision also denies the remaining allegations in paragraph 40.

### F.     The Proposed Merger Is Driven by NCM's Desire to Eliminate Competition from Screenvision

> **ALLEGATION 41:**  By April 2014, NCM had arrived at what it called a "Strategy Decision Crossroads," identifying two possible ways to cope with Screenvision's competitive tactics. One option, "Plan A," was to acquire Screenvision, which NCM executives had been considering for some time. As NCM previously had concluded, acquiring Screenvision would give NCM the ability to "Control Selling Tactics," including "Pricing." NCM's "Plan B" was to compete with Screenvision by "[r]eset[ting] NCM CPMs to current market levels" and "continuing to expand impression base through Affiliate additions." By early May 2014, NCM had resolved its internal debate, choosing to buy Screenvision instead of competing with it.

41.     Screenvision denies the allegations in paragraph 41, which present a grossly

misleading portrayal of the cited documents.  Screenvision admits that NCM made an offer to

acquire Screenvision, and that Screenvision accepted this offer in early May 2014.  Screenvision

denies that the proposed merger is driven by a desire to eliminate competition.  Rather,

Screenvision admits that proposed merger is driven by a desire to create a more significant

cinema advertising network that will have ubiquitous coverage, and thus will be able to better

compete with other forms of advertising in the overall video market, including television. To the

extent that the allegations in paragraph 41 pertain to the actions of another company,

Screenvision lacks knowledge or information sufficient to form a belief as to the truth of those

allegations, and denies them on that basis.

## V.  THE RELEVANT MARKETS

**ALLEGATION 42:**  Cinema advertising networks operate in two distinct markets: preshow services sold to exhibitors and cinema advertising sold to advertisers.

42.     Screenvision denies the allegations in paragraph 42.

### A.     Preshow Services

**ALLEGATION 43:**  Preshow services consist of the packaging of advertisements and content into a preshow delivered to exhibitors, enabling them to earn revenue from the use of their screens before the feature film. The price charged to exhibitors for preshow services is the portion of advertising revenue retained by the network. Preshow services constitute a relevant product market and line of commerce under Section 7 of the Clayton Act. There are no reasonable substitutes for preshow services. Exhibitors cannot easily replace the preshow services they buy from cinema advertising networks because individual exhibitors generally lack sufficient screens and geographic reach to secure national advertising. Nor can they sufficiently replace national advertising in preshows with local advertising because local advertising generates much less revenue than national advertising.

43.     Screenvision denies that its business dealings with exhibitors are appropriately

characterized as the sale of "preshow services." To the contrary, Screenvision buys rights to

display advertising in exhibitors' theaters. Screenvision sells an advertising product to

advertisers which requires access to theaters immediately prior to the showing of a film.

Screenvision buys access to exhibitors' theaters; offers that access to advertisers; and services

the product by packaging advertising with a preshow program that is delivered to and shown by

its exhibitor partners. Screenvision also admits that its exhibitor partners display the preshow on

their movie screens in exchange for a share of the advertising revenue. Screenvision further

admits that all of the advertising proceeds are split between the Screenvision and its exhibitor

partners through revenue-sharing agreements.  To the extent that paragraph 43 contains legal

argument and conclusions, no response is required.  To the extent that a response is required,

Screenvision denies the remaining allegations in paragraph 43.

> **ALLEGATION 44:**  A well-accepted methodology for assessing a relevant market for
> antitrust analysis is to ask whether a hypothetical monopolist over all products in the
> market would profitably impose at least a small but significant and non-transitory
> increase in price, or SSNIP. *Fed. Trade Comm'n & U.S. Dep't of Justice Horizontal
> Merger Guidelines* (2010). The market for preshow services satisfies this test. Because
> there are no reasonable substitutes for preshow services, a hypothetical monopolist of all
> such services would increase price by at least a SSNIP.  Thus, the market for preshow
> services is an antitrust relevant market.

44.     Paragraph 44 contains legal argument and conclusions to which no response is

required.  To the extent that a response is required, Screenvision denies the remaining allegations

in paragraph 44.

### B.     Cinema Advertising

> **ALLEGATION 45:**  Cinema advertising is the on-screen advertising incorporated in the
> preshow. The sale of cinema advertising to advertisers is a relevant product market and
> line of commerce under Section 7 of the Clayton Act. Cinema advertising has important
> attributes that differentiate it from other forms of video advertising. For example, the
> preshow is projected on a large screen with high-quality video and sound in a darkened
> auditorium. In contrast to TV and other video advertising platforms, the audience cannot
> avoid the advertisements by fast forwarding through them, clicking past them, or
> changing a channel. The preshow also allows for long-form advertisements typically not
> available on TV, and it reaches a weekend audience and light TV viewers who are
> otherwise difficult to reach.

45.     Paragraph 45 contains legal argument and conclusions to which no response is

required.  To the extent that a response is required, Screenvision specifically denies that cinema

advertising is a relevant product market, and admits that the relevant product market is video

advertising—of which cinema advertising represents less than one percent.  Screenvision denies

that the fact that cinema advertising has factors that differentiate it from other forms of

advertising in the video advertising market means that cinema advertising is its own market. Screenvision denies the remaining allegations in paragraph 45.

> **ALLEGATION 46:**  Many advertisers value the combination of attributes afforded by cinema advertising, and few would switch to other forms of video advertising in response to a SSNIP of cinema advertising. A hypothetical monopolist over all cinema advertising would profitably impose a SSNIP and thus, the market for cinema advertising is an antitrust relevant market.

46.       Paragraph 46 contains legal argument and conclusions to which no response is required.  To the extent that a response is required, Screenvision denies the remaining allegations in paragraph 46, and specifically notes that during its investigation, Plaintiff asked certain advertisers questions aimed at determining whether they would switch to other forms of video advertising in a response to a SSNIP of cinema advertising and those advertisers said they would switch—meaning that a hypothetical monopolist could not profitably impose a SSNIP over cinema advertising.

> **ALLEGATION 47:**  NCM and Screenvision compete with each other throughout the United States. Exhibitors and advertisers in the United States would not switch to cinema advertising networks located outside the United States in the event of a SSNIP in the United States. Accordingly, the United States is a relevant geographic market within the meaning of Section 7 of the Clayton Act.

47.       Screenvision admits that it sometimes competes against NCM and other third parties for buying rights to display preshow advertising in exhibitors' theaters in the United States.  To the extent that paragraph 47 contains legal argument and conclusions, no response is required.  To the extent that a response is required, Screenvision denies the remaining allegations in paragraph 47.

## VI. ANTICOMPETITIVE EFFECTS

### A.       The Proposed Transaction Would Eliminate Competition in the Market for Preshow Services

**ALLEGATION 48:**  NCM's acquisition of Screenvision would end the vigorous competition between these firms, leaving exhibitors at the mercy of a monopolist.

Because these firms closely monitor each other and battle for market share, the competition between them provides tangible benefits for exhibitors with respect to price and quality. If allowed to proceed, the merger would eliminate the competition that has yielded these benefits, potentially forcing exhibitors to raise prices to consumers or forgo theater improvements in order to offset the resulting reduction in revenue.

48.     Screenvision admits that this merger—like all mergers—would eliminate competition between the merging parties, but Screenvision denies this merger would "leav[e] exhibitors at the mercy of a monopolist."  In particular, Screenvision denies that exhibitor partners, many of whom enjoy long-term revenue-sharing agreements, would be worse off as a result of this merger.  Indeed, Screenvision admits that, because of its revenue-share agreements with exhibitors, even the most modest of increases of advertising as a result of the transaction will make exhibitors much better off than they would be if the transaction were blocked. Screenvision also admits that while it monitors NCM's actions and "battle[s] for market share," it monitors and battles many other providers of other forms of video advertising, and NCM will continue to do so after the merger.  To the extent that paragraph 48 contains legal argument and conclusions, no response is required.  To the extent that a response is required, Screenvision denies the remaining allegations in paragraph 48.

**ALLEGATION 49:**  NCM would be free to impose its will on exhibitors and likely would offer them reduced financial inducements, e.g., lower revenue shares, minimum guarantees, and upfront payments. NCM is also likely to stop offering its exhibitors the greater flexibility and control over the preshow that is a hallmark of Screenvision's competitive strategy.

49.     Screenvision denies that a post-merger NCM "would be free to impose its will" on its exhibitor partners, most of whom enjoy long-term revenue-sharing agreements that guarantee the revenue shares, minimum guarantees and upfront payments long into the future. Accordingly, Screenvision admits that the overwhelming majority of exhibitors can only benefit from the upside of the transaction (e.g., added revenue from increased advertising).  To the extent that paragraph 49 contains legal argument and conclusions, no response is required.  To

the extent that a response is required, Screenvision denies the remaining allegations in paragraph

49.

> **ALLEGATION 50:**  Even before the expiration of their contracts, exhibitors likely
> would suffer from the loss of competition because the contracts do not completely
> insulate them from harm. For example, under the existing contracts, when an advertiser
> buys less than the entire network of movie screens, Defendants have the ability to steer
> advertising to the theaters of their choice. Post-merger, in the absence of competition, the
> combined firm would have the ability and incentive to favor exhibitors that have signed
> new contracts on less favorable terms or favor its Founding Members (Regal, AMC, and
> Cinemark) by placing more lucrative advertisements with them. Pre-merger, the prospect
> of competition at the end of a contract term creates an incentive for Defendants to market
> advertising time to maximize their chances of retaining independent exhibitor affiliates.

50.     Screenvision denies that exhibitors likely would suffer from any loss of

competition occasioned by the merger.  Screenvision denies it "steers" advertising to favor

certain theaters in the manner Plaintiff alleges.  Screenvision competes against ubiquitous forms

of advertising such as television, digital, and mobile advertising, which creates a powerful

natural incentive for Screenvision to first and foremost place ads where its advertisers want

them.  To the extent that paragraph 50 contains legal argument and conclusions, no response is

required.  To the extent that a response is required, Screenvision denies the remaining allegations

in paragraph 50.

> **ALLEGATION 51:**  For certain NCM exhibitors, the proposed merger has already
> resulted in a meaningful loss of competition. Before the decision to merge with NCM,
> Screenvision had viewed the "next couple of years as opportunistic years to potentially
> gain some share from [NCM]" by going after exhibitors whose contracts were expiring.
> But the decision to merge dampened Screenvision's appetite to compete for these
> contracts. As Screenvision's head of exhibitor relations testified, "[I]f we had not
> announced a merger six months ago, I would know exactly what's expiring when, but
> I've kind of not pursued those circuits, because I don't think they would think about
> signing a deal with Screenvision – moving from NCM to sign a deal with Screenvision
> when they may be – we may be one company by that time."

51.     Screenvision denies that for certain NCM exhibitors, the proposed merger has

already resulted in a meaningful loss of competition, in particular because the merger "dampened

Screenvision's appetite to compete for [exhibitor] contracts."  To the contrary, because

advertisers demand ubiquitous national coverage, expanding Screenvision's exhibitor network

was (and is) a priority of Screenvision's, and Screenvision has competed aggressively since the

merger was announced.  Screenvision further admits that the uncertainty surrounding the

proposed merger caused by Plaintiff's investigation and Complaint has impacted exhibitor

interest in signing exhibitor contacts with Screenvision.  Screenvision admits that its head of

exhibitor relations said the language quoted in paragraph 51, and that the quoted language speaks

for itself.  To the extent Plaintiff alleges the quoted language is a broader admission by

Screenvision, such allegations are denied.  Screenvision also denies the remaining allegations

contained in paragraph 51.

> **ALLEGATION 52:**  Defendants have already taken steps to stabilize current rates and
> contract terms. Before the merger announcement, Defendants had been competing
> aggressively for exhibitors, offering increasingly better financial terms and other
> incentives. After the merger announcement, NCM and Screenvision offered to freeze
> existing contract rates for an additional five years, which served to deprive exhibitors of
> the benefits of head-to-head competition that likely would have occurred if not for the
> proposed merger. In doing so, NCM made one key change, eliminating "minimum patron
> guarantee" escalation clauses that had served to protect exhibitor revenues. These clauses
> had been offered when NCM and Screenvision were competing aggressively against each
> other but, looking at a future without competition from Screenvision, NCM determined it
> no longer needed to offer them.

52.     Screenvision denies that Defendants have already taken steps to stabilize current

rates and contract terms, and specifically that the contract extensions referenced constitute any

such thing.  Screenvision admits that it unilaterally decided to offer five-year contract extensions

to many of its exhibitor partners in September 2014, and that by doing so it was providing

exhibitors protection against the theoretical harm that Plaintiff alleged the merger would cause.

Screenvision admits that, despite the fact that the extensions addressed Plaintiff's articulated

concern, Plaintiff instructed Screenvision to stop offering such extensions, and Screenvision

complied with that request.  To the extent that the allegations in paragraph 52 pertain to the

actions of another company, Screenvision lacks knowledge or information sufficient to form a

belief as to the truth of those allegations, and denies them on that basis.  Screenvision also denies

any remaining allegations in paragraph 52.

> **ALLEGATION 53:**  Neither NCM nor Screenvision likely would have pursued a
> blanket contract extension strategy in the absence of the proposed merger. When asked
> whether Screenvision had ever previously offered such a blanket contract extension,
> Screenvision's CEO replied: "No, we haven't." He explained, "Well, we actually never in
> the past ever expected we would get any positive response from sending out these
> notices." Before the merger announcement, exhibitors seeking to improve contract terms
> at renewal likely would have been unwilling to extend their existing rates and terms for
> an additional five years. The announcement of the proposed merger changed this calculus
> – making the extension of today's rates more appealing than the prospect of negotiating
> new rates and terms with a monopolist.

53.     Screenvision admits that its CEO said the language quoted in paragraph 53, but

denies that the statement has been presented fairly and in context.  Screenvision also denies the

remaining allegations contained in paragraph 53, and specifically notes that, given that the

majority of exhibitors did not accept the proposed contract extensions, those exhibitors implicitly

disagreed with both the allegation contained in the last sentence of paragraph 53 as well as

Plaintiff's theory of harm.

> **ALLEGATION 54:** Finally, if the merger were allowed to proceed, independent
> exhibitors would lose the option of buying preshow services from a network that is not
> jointly owned by the three largest exhibitors in the United States – Regal, AMC, and
> Cinemark. These exhibitors, NCM's Founding Members, exercise a significant degree of
> influence over NCM, including the ability to affect NCM's dealings with competing,
> independent exhibitors. For example, the Founding Members have the right to block
> NCM from entering into contracts with expenditures exceeding $1 million. Upfront
> payments exceeding $1 million are common when NCM and Screenvision compete
> aggressively for exhibitors, and NCM has to submit such proposed independent exhibitor
> contracts to the Founding Members for their review and approval. Moreover, NCM has
> consulted with Founding Members' executives on proposed contract terms that NCM is
> considering offering to independent exhibitors, including whether NCM should
> implement the recent strategy to offer five-year contract extensions.

54.     Screenvision denies that its business dealings with exhibitors are appropriately

characterized as the sale of "preshow services."  To the contrary, Screenvision buys rights to

display advertising in exhibitors' theaters.  To the extent that the allegations in paragraph 54

pertain to the actions of another company, Screenvision lacks knowledge or information

sufficient to form a belief as to the truth of those allegations, and denies them on that basis.  To

the extent that paragraph 54 contains legal argument and conclusions, no response is required.

To the extent that a response is required, Screenvision denies the remaining allegations in

paragraph 54.

> **ALLEGATION 55:**  NCM's ownership structure is an important consideration for many
> exhibitors in choosing between NCM and Screenvision. One Screenvision executive who
> works on deals with exhibitors described the "competitive advantage" of Screenvision's
> ownership structure: "[W]e cater to many independent theatre owners, where NCM has a
> tendency to express favoritism towards their 3 founding exhibitors." The Founding
> Members would have the incentive to raise their rivals' costs for preshow services and
> the ability to do so through their influence over the operation of the merged firm. The
> competitive effects of the proposed merger are likely to be more pronounced as a result
> of this incentive.

55.     Screenvision admits that it produced documents which contain the quoted

language in paragraph 55, and that the documents speak for themselves.  To the extent Plaintiff

alleges the quoted statements are broader admissions by Screenvision, such allegations are

denied.  To the extent that the allegations in paragraph 55 pertain to the actions of another

company, Screenvision lacks knowledge or information sufficient to form a belief as to the truth

of those allegations, and denies them on that basis.  To the extent that paragraph 55 contains

legal argument and conclusions, no response is required.  To the extent that a response is

required, Screenvision denies the remaining allegations in paragraph 55.

> **B.      The Proposed Transaction Would Eliminate Competition between NCM and
> Screenvision for Advertisers**

**ALLEGATION 56:**  NCM's acquisition of Screenvision would also end the vigorous
competition between NCM and Screenvision for the sale of cinema advertising. For
NCM and Screenvision, by far the most important constraint when they negotiate with
advertisers is the risk that advertisers will turn to the other network. The merger would
remove that competitive constraint. Screenvision's aggressive tactics over the past 18
months have triggered a price war between the firms, resulting in substantially lower
prices and better terms for advertisers. If allowed to proceed, the merger would eliminate

the competition that has yielded these benefits and lead to higher prices. For NCM, the prospect of eliminating this vigorous competition was a key driver of the deal.

56.     Screenvision denies the allegations contained in paragraph 56 and specifically denies that it is possible for cinema advertising networks to exert market power over advertisers—given that no advertiser relies exclusively on cinema, many advertisers do not even use cinema, and cinema only accounts for less than one percent of all video advertising dollars spent by advertisers.  Screenvision also denies that its most important constraint is that an advertiser will turn to another cinema network.  Indeed, often times when Screenvision is unable to reach a deal with an advertiser, the money allocated for that sale either is not used or is used on another form of video advertising.  To the extent that the allegations in paragraph 56 pertain to the actions of another company, Screenvision lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and denies them on that basis.  To the extent that paragraph 56 contains legal argument and conclusions, no response is required.  To the extent that a response is required, Screenvision denies the remaining allegations in paragraph 56.

> **ALLEGATION 57:**  The merger would also eliminate an important source of innovation for advertisers. Screenvision has been a driving force behind recent quality improvements, leading NCM executives to push their teams to "stay on top of our game." As one NCM executive noted, "it's not just about price, [Screenvision] caves on every point and gives clients/agencies everything they ask for and more." A 2014 annual survey of agencies and advertisers confirmed this observation, with Screenvision receiving top ranking in nearly every category, including for "Innovative and Creative Opportunities" and "Advanced Research Insights and Support."

57.     To the extent that the allegations in paragraph 57 pertain to the actions of another company, Screenvision lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and denies them on that basis.  To the extent that paragraph 57 contains legal argument and conclusions, no response is required.  To the extent that a response is required, Screenvision denies the remaining allegations in paragraph 57.

**ALLEGATION 58:** Screenvision has also been a leader in targeted advertising and has offered advertisers greater accountability for results. For example, in 2012, Screenvision began offering advertisers demographic guarantees, which represented a sea change in cinema advertising. As NCM's President of Marketing and Sales observed, "my reluctance to do [demographic guarantees] for ten years has been a key strategy and saves us millions of dollars. . . . I knew that the buyers would like them, but I felt that we could get away with not giving demo guarantees and minimize some downside risk." With Screenvision introducing this method of purchasing cinema advertising, however, it "create[d] the necessity for [NCM] to do the same."

58. Screenvision admits that it changed its overall national advertising sales strategy beginning in late 2012 to better compete with other forms of video advertising, including television. Screenvision also admits that this national advertising sales strategy attempted to mirror many attributes available in television advertising, such as demographic guarantees, but Screenvision denies that it can offer advertisers comparable levels of targeting and demographic guarantees to those that television can without the scale provided by this merger. To the extent that the allegations in paragraph 58 pertain to the actions of another company, Screenvision lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and denies them on that basis. Screenvision also denies the remaining allegations in paragraph 58.

**ALLEGATION 59:** In these ways and more, Screenvision has spurred lower prices, innovation, and quality improvements in cinema advertising. If the merger were allowed to proceed, NCM would no longer face this important competitive pressure.

59. To the extent that the allegations in paragraph 59 pertain to the actions of another company, Screenvision lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and denies them on that basis. To the extent that paragraph 59 contains legal argument and conclusions, no response is required. To the extent that a response is required, Screenvision denies the remaining allegations in paragraph 59.

## VII. ABSENCE OF COUNTERVAILING FACTORS

### A.    Barriers to Entry and Expansion Are High

**ALLEGATION 60:**  The entry barriers associated with developing a cinema advertising network are high, and thus new entry or expansion by existing competitors is unlikely to prevent or remedy the proposed merger's likely anticompetitive effects. Barriers to entry and expansion include the time and cost of developing a network of screens to achieve sufficient scale, NCM's and Screenvision's lock-up of almost all exhibitors in the United States through staggered long-term contracts, and the time and cost of building the infrastructure necessary to develop and attract national advertisers.

60.     Screenvision admits that many of its exhibitor partners have entered into long-term contracts with the company that ensure those exhibitors a share of Screenvision's ad revenues (e.g., a 50-50 revenue split) for many years.  Screenvision admits that its exhibitor contracts are staggered, such that if Screenvision attempted to impose anticompetitive terms when seeking to negotiate with a particular exhibitor, then Screenvision's remaining exhibitors would learn of this fact well in advance of their renegotiations and could take a number of different steps to protect themselves, including negotiating terms with other suppliers of cinema advertising or inducing other firms with advertising expertise to enter into the cinema advertising category.  Screenvision admits that a cinema advertising firm must enter into agreements with exhibitors, sell ad space to advertisers, and prepare and distribute a pre-show containing those ads, but Screenvision denies that these basic business demands represent a meaningful barrier to entering the category.  Paragraph 60 contains legal argument and conclusions to which no response is required.  To the extent that a response is required, Screenvision denies the remaining allegations in paragraph 60.

**ALLEGATION 61:**  Exhibitors cannot supply preshow services themselves as an effective alternative to the merged company. Individual exhibitors or groups of small exhibitors whose contracts with NCM or Screenvision are expiring are unlikely to be able to establish cost-effective sales forces, attract national advertisers, or otherwise develop a sufficient infrastructure to reasonably replace the merged company.

61.     Screenvision denies that its business dealings with exhibitors are appropriately characterized as "supply[ing] preshow services."  To the contrary, Screenvision buys rights to display advertising in exhibitors' theaters.  Paragraph 61 contains legal argument and

conclusions to which no response is required.  To the extent that a response is required, Screenvision denies the remaining allegations in paragraph 61.  In particular, Screenvision denies that exhibitors cannot sell local ad spots instead of partnering with Screenvision.  An exhibitor that sells local advertising itself (or that partners with a local cinema advertising firm) may retain more of the revenue that those ads generate than the revenue share it makes with Screenvision. An exhibitor may also prefer to focus on selling local advertising as a way to differentiate itself from other exhibitors in the area and/or to better serve its community.

### B.   Defendants' Claimed Efficiencies Should Not Be Credited

**ALLEGATION 62:**  Defendants claim that the merger would enable them to offer ubiquitous coverage, leading to an increase in both the CPMs paid by advertisers and the number of cinema advertisements sold. However, advertisers already can obtain ubiquitous coverage – they easily can, and often do, purchase cinema advertisements across both of Defendants' networks. To the extent advertisers were to pay higher CPMs as a result of the merger, it would be due to the elimination of competition and the exercise of market power by the merged firm. Defendants also claim that the merger would enable them to target advertisements more effectively, but it is unlikely that Defendants' ability to target as a combined company would be materially better than it is today. Defendants cannot demonstrate that these or any other claimed efficiencies are merger specific or sufficient to counteract the anticompetitive effects that would inevitably flow from creating a monopoly. Defendants' efficiencies claims amount to a bald assertion that bigger is somehow better for both advertisers and exhibitors even though the merger would leave them with only one supplier of cinema advertising and preshow services.

62.     Screenvision denies that the competitive effects implications of product improvement in a market characterized by revenue-sharing agreements are appropriately called "efficiencies claims."  Screenvision admits that this merger will create a cinema advertising network with better scale, coverage, and targeting capabilities, and that this more robust cinema advertising network will be more attractive to advertisers.  Screenvision also admits that it believes the combined cinema advertising network will lead to higher utilization by advertisers and, as a result of its revenue-share agreements with exhibitors, greater revenue for exhibitors. Indeed, Screenvision admits that if the transaction results in the equivalent of just one national

advertiser buying one 30 second spot for a year, that would more than offset even a 10 percent reduction in exhibitors' revenue shares.  Screenvision denies that it is possible to achieve the scale necessary for effective targeting and demographic guarantees through purchasing across both networks, and notes that because of the costs and difficulties associated with buying across both networks, many national advertisers choose to spend less on cinema or decide to simply not advertise on cinema at all.  To the extent that the allegations in paragraph 62 pertain to the actions of another company, Screenvision lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and denies them on that basis.  To the extent that paragraph 62 contains legal argument and conclusions, no response is required.  To the extent that a response is required, Screenvision denies the remaining allegations in paragraph 62.

### VIII. VIOLATION ALLEGED

**ALLEGATION 63:**  The United States alleges and incorporates paragraphs 1 through 62 as if set forth fully herein.

63.     Screenvision incorporates its admissions and denials from paragraphs 1 through 62 as if set forth fully herein.

**ALLEGATION 64:**  The effect of the proposed transaction, if approved, likely would be to lessen competition substantially, and to tend to create monopoly, in interstate trade and commerce in the relevant markets, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

64.     Screenvision denies the allegations in paragraph 64.

**ALLEGATION 65:**  Among other things, the transaction would likely have the following effects:

(a) Eliminating significant head-to-head competition between NCM and Screenvision in the provision of preshow services to exhibitors;

(b) Creating a combined NCM-Screenvision with the ability to increase the revenue share received by the merged firm, and reduce or eliminate guaranteed minimum payments and upfront payments made to exhibitors;

(c) Creating a combined NCM-Screenvision with the ability to reduce the quality of preshow services to exhibitors;

(d) Eliminating significant head-to-head competition between NCM and Screenvision for the sale of cinema advertising; and

(e) Causing prices to rise for cinema advertising.

65.     Screenvision denies the allegations in paragraph 65.

## IX.  REQUEST FOR RELIEF

**ALLEGATION 66:**  The United States requests:

(a) That the acquisition of Screenvision by NCM Inc., and the subsequent contribution of Screenvision's assets to NCM LLC, be adjudged to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

(b) That Defendants be permanently enjoined and restrained from carrying out the planned acquisition of Screenvision by NCM Inc. or any other transaction that would combine the two companies, or would combine Screenvision and NCM LLC;

(c) That Defendants rescind, at the option of the exhibitor, all contract extensions and contracts executed after the announcement of the proposed transaction on May 5, 2014;

(d) That the United States be awarded its costs of this action; and

(e) That the United States be awarded such other relief as the Court may deem just and proper.

66.     Screenvision denies that the United States is entitled to any of the relief it is

seeking.

## X.  AFFIRMATIVE DEFENSES

Screenvision asserts the following affirmative defenses without assuming the burden of

proof as to any issue that would otherwise rest with Plaintiff.

## FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim on which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

NCM's acquisition of Screenvision will result in substantial merger-specific efficiencies and other pro-competitive benefits that counteract and outweigh any and all purported anticompetitive effects alleged by Plaintiff.

## THIRD AFFIRMATIVE DEFENSE

The contemplated relief would not be in the public interest because it would, among other things, harm the very entities the United States purports here to protect, e.g., exhibitors and advertisers.

## FOURTH AFFIRMATIVE DEFENSE

Screenvision has not knowingly or intentionally waived any applicable defenses, and it expressly reserves the right to plead additional affirmative defenses and other defenses as they become known to Screenvision.

**WHEREFORE**, Screenvision respectfully requests that the Court:

1.    Deny Plaintiff's contemplated relief;

2.    Dismiss the Complaint in its entirety with prejudice;

3.    Award Screenvision its costs of suit, including reasonably attorneys' fees, and;

4.      Award such other and further relief as the Court deems just and proper.


Dated: November 24, 2014


Respectfully submitted,


/s/ Daniel M. Wall
Daniel M. Wall (admitted *pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 395-0600
(415) 395-8095 (facsimile)
dan.wall@lw.com

*Counsel for Defendants SV Holdco, LLC and
Screenvision, LLC*